Michael SHRODER, et al.,
Plaintiffs-Appellants,

v.

SUBURBAN COASTAL CORPORATION,
Defendant-Appellee.

No. 82–6086.

United States Court of Appeals,
Eleventh Circuit.

April 16, 1984.

Spieler & Spieler, P.A., Gregg Spieler, Miami, Fla., for plaintiffs-appellants.

Carlton, Fields, Ward, Emmanuel, Smith & Culter, P.A., Davisson F. Dunlap, Robert L. Young, Orlando, Fla., for defendant-appellee.

Before HILL and HATCHETT, Circuit Judges, and ALLGOOD *, District Judge.

HATCHETT, Circuit Judge:

In this Truth-in-Lending Act case we examine the provisions of a Truth-in-Lending disclosure statement to determine whether it is deficient under the Act and regulations. We find it deficient and reverse and remand the case.

## Background

On October 7, 1980, Michael Shroder, Susan Shroder, and Gregory Pillon, individually and as representatives of a class, brought this action alleging that Suburban Coastal Corporation (Suburban Coastal) had violated four provisions of the TILA and Regulation Z.

Suburban Coastal is a New Jersey corporation in the business of making purchase money mortgages to consumers and selling and assigning mortgages to third parties. Michael Shroder is a physician, and Susan Shroder, his wife, is a homemaker. In 1979, Michael and Susan Shroder (the Shroders) signed a contract to purchase a house in Dade County, Florida. Thereafter, they contacted Suburban Coastal in order to finance the purchase of the house. After finding that Suburban Coastal was charging the lowest interest rate for home mortgages, they applied to Suburban Coastal for a purchase money mortgage.

The parties selected Town and Country Title Guaranty and Escrow, Inc. (Town and Country) to conduct the closing. Suburban Coastal sent to Town and Country a closing package consisting of closing instructions, an uncompleted Real Estate Settlement Procedure Act statement, an uncompleted Truth-in-Lending statement, and other documents. At the closing, Gregg Spieler, a lawyer, represented the Shroders. Because he was performing an operation, Michael Shroder was not present at the closing. Although Suburban Coastal loaned the funds for the purchase of the house, it did not conduct the closing nor send a representative. Neither Susan Shroder nor her attorney asked any questions or made any complaints relating to the Truth-in-Lending disclosure statement at the time of closing.

Since January 31, 1977, Gregg Spieler's law firm has employed Gregory Pillon as a title examiner. In 1979, Pillon sought to purchase a house. Suburban Coastal loaned the funds for the purchase. At the closing, Pillon reviewed all the documents, including the Truth-in-Lending disclosure statement, and raised no questions concerning the documents.

Eight months after the Shroders' closing, Gregg Spieler, the attorney who represented the Shroders and who employed Pillon as a title examiner, brought this suit for the Shroders. The lawsuit contends that the Truth-in-Lending disclosure statement issued by Suburban Coastal is deficient. Suburban Coastal used the same note, mortgage, and Truth-in-Lending disclosure statement utilized in the Shroders' closing in 492 other purchase money mortgage transactions in Dade County, Florida, within one year of the bringing of this action. The allegation in this class action is that Suburban Coastal presented each of the 492 individuals with a deficient Truth-in-Lending disclosure statement. The action

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

seeks to impose liability against Suburban Coastal for four violations of the Truth-in-Lending Act (TILA) (15 U.S.C.A. §§ 1601–1667e)[1] and Regulation Z (12 C.F.R. §§ 226.1–226.1503).[2] The United States District Court for the Southern District of Florida entered an order denying the Shroders' motion for class certification. The district court subsequently entered an order granting Suburban Coastal's motion for summary judgment and denying the Shroders' motion for summary judgment. The district court entered final judgment in favor of Suburban Coastal.

We must determine whether the district court properly denied class certification, properly entered summary and final judgment for Suburban Coastal, or improperly denied summary judgment to the Shroders.

### Discussion

■ In reviewing a district court's denial of class certification, the sole issue on appeal is whether the district court abused its discretion in denying appellants the right to maintain a class action. *Boggs v. Alto Trailer Sales, Inc.*, 511 F.2d 114 (5th Cir. 1975). "The discretion of the district court in determining whether a class action may be maintained is to be exercised within the parameters of the criteria of rule 23 … assuming discretion exercised within these parameters, the determination of the trial court should stand absent an abuse of discretion." *Boggs*, 511 F.2d at 117. The fact that the Court of Appeals might have granted class certification if the case were before it *de novo* is irrelevant. The only issue before a court of appeals is whether a district court abused its discretion when it granted or denied class certification. *Wat-*

*kins v. Simmons and Clark, Inc.*, 618 F.2d 398 (6th Cir.1980).

Federal Rule of Civil Procedure 23(a)(4)[3] specifically states that a prerequisite to a class action is that the representative parties will fairly and adequately protect the interests of the class. The district court, in denying the Shroders' motion for class certification, stated that it was not convinced, due to the relationship between the named plaintiffs and Spieler, that the class interests would be adequately represented and protected.

Pillon, at the time of the closing and since January 31, 1977, has been employed in Spieler's law office. Pillon is a named representative in this case. The question is whether this employment relationship between a named representative and the class attorney is such as to cause a court to properly conclude that this named representative will not fairly and adequately protect the interests of the other class members.

The courts have held that basic consideration of fairness requires that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation where absent members will be bound by the court's judgment. *Susman v. Lincoln American Corp.*, 561 F.2d 86 (7th Cir.1977), *appealed after remand*, 587 F.2d 866 (7th Cir.1978). In *Susman*, the court held that the plaintiffs were inadequate to act as class representatives where one plaintiff and one of the plaintiffs' attorneys of record were members of the same law firm. The court, in addition, held that an individual was an

---

**1.** TILA was amended by the Truth-in-Lending Simplification Act (TILSA). The TILSA amendments became enforceable, optional compliance ended, as of October 1, 1982. In this opinion, however, all references to TILA will be to the pre-TILSA Act.

**2.** The Federal Reserve Board set forth a revised Regulation Z which became effective April 1, 1981, but compliance was optional until October 1, 1982. In this opinion, however, all references to Regulation Z will be to the pre-TILSA Regulation Z and not to the current Regulation Z.

**3.** Federal Rule of Civil Procedure 23(a) states:
 Rule 23. Class Actions
 (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

inadequate representative of the class where his brother was serving as attorney for the class.

> Even though plaintiff does not expect to share in any attorney's fees recovered in this cause, there exists the possibility that one so situated will become more interested in maximizing the 'return' to his counsel than in aggressively presenting the proposed class' action.

*Susman,* 561 F.2d at 95. The *Susman* quote stresses that even in cases where the named representative would not benefit financially from the award of attorney's fees, the representative may seek to maximize the return to his attorney. The representative is likely to do this where he has an interest in the representation and goodwill of his law firm which would be enhanced by a large attorney's fee award.

In this case, Pillon is not an attorney in Spieler's law firm, but continues to be an employee of the law firm. Although Pillon may not share in the award of attorney's fees to Spieler in the event the class is victorious, a clear possibility remains that Pillon is interested in maximizing the return to his employer. Pillon is concerned with his future employment. Consequently, a court could rationally conclude that Pillon would be more concerned with satisfying his employer than with representing the interests of the unnamed class members.

In *Turoff v. May Co.,* 531 F.2d 1357 (6th Cir.1976), the court held that the named plaintiffs, three of whom were attorneys with the law firm for the class and the fourth of whom was the wife of one of the first three, did not have standing to represent the class.

> Because the financial recovery for reasonable attorney's fees would dwarf the individual's recovery as a member of the class herein, the financial interests of the named plaintiffs and of the class are not coextensive. If the interests of a class are to be fairly and adequately protected, if the courts and the public are to be free of manufactured litigation, and if proceedings are to be without cloud, the roles of class representative and of class attorney cannot be played by the same person.

*Turoff,* 531 F.2d at 1360. Since possible recovery of the class representative is far exceeded by potential attorney's fees, courts fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members. *Susman,* 561 F.2d at 91.

In TILA cases, courts may award reasonable attorney's fees to the prevailing class. Since Pillon is not a partner of the firm, it is unlikely that he will receive a percentage of the attorney's fees awarded to Spieler's firm if the class is victorious. In analyzing whether Pillon would be an adequate representative of the class members, we must return to the statement in *Susman* that an individual is an improper representative where there is a possibility that he will be more interested in maximizing the "return" to his attorney than in aggressively presenting the proposed class action. In the present case, this possibility clearly exists. Pillon's employment relationship with the law firm is not minimal. In his deposition, Pillon stressed that even though he does some work for others, his primary employer is Spieler's law firm. His employment gives him a financial stake in the firm which may sway his undivided interests in pursuing the interests of the class. In matters relating to settlement and the settlement amount, Pillon, as a named representative, will play a major role. These decisions will directly affect Spieler and his law firm. There clearly exists the possibility that, in making the above-cited decisions, Pillon will be concerned not so much with other class members as he will be in pleasing his employer.

The Fifth Circuit, in *Phillips v. Joint Legislative Com., Etc.,* 637 F.2d 1014 (5th Cir.1981), upheld class certification where one of the three named plaintiffs was an attorney with the firm serving as class counsel. The court addressed itself to the narrow issue of whether the class representative may be too generous with the

class's money in granting a fee to his own partner or spouse. The *Phillips* court stressed that this problem did not arise in its case, because any attorney's fees granted would come directly from the defendants under 42 U.S.C.A. § 2000e–5(k) (1976), and not from any fund created for class relief.

*Phillips* is distinguishable from the present case. First, *Phillips* is a civil rights case, not a TILA action. Throughout our legal history, a shortage has existed of plaintiffs willing and available to file civil rights class actions. The courts are thus, quite rightly, hesitant to deny class certification in civil rights cases. Though the legislative history of TILA does indicate a desire to promote class actions, a TILA suit is clearly distinguishable from a civil rights action.

■ Second, in accordance with *Phillips*, we recognize that no opportunity exists for Pillon to be too generous with the class's money, for the main reason that the court, in TILA cases, awards attorney's fees. We are, however, concerned with the fact that where a named representative is also an employee of class counsel, that named representative may be more concerned with maximizing the return and with satisfying the needs of class counsel than he is with the needs of other class members. In answering questions of when to settle and how much to settle for, a named representative who is an employee of class counsel may arrive at answers which benefit not the class, but the class counsel.

In this case there are but three named representatives. The court in *Sommers v. Abraham Lincoln Federal Savings and Loan Association*, 66 F.R.D. 581 (1975), held that a class may be certified where a named representative would not adequately represent the interests of the class where there has been intervention of numerous other proper named plaintiffs. In this case there has been no such intervention. The fact that one of three named representatives is clearly an inadequate representative, supports the conclusion of the district court that the Shroders are improper representatives of the class.[4]

We hold that the district court did not abuse its discretion when it denied class certification based upon Federal Rule of Civil Procedure 23(a)(4).

■ The district court was incorrect when it held that there was inadequate representation due to the fact that each class member would receive substantially less in damages than if he or she were to proceed individually. The courts have held that denying class certification because class recovery would be minimal is no long-

**4.** We have chosen to limit our analysis of inadequate representation to the case of Pillon for the primary reason that this type of representation could easily produce ominous results for the other class members.

We are not convinced that Michael and Susan Shroder alone would be adequate representatives. The class counsel accompanied Susan Shroder to the closing. The distinct possibility exists that he could be called as a witness to discuss what transpired at the closing. Counsel for the Shroders is adamant in his belief that what occurred at the closing is irrelevant to the question of TILA violations. We recognize that in TILA cases recovery is not barred where the violation was technical or where the consumer was not deceived by the violation. The possibility continues to exist, however, that Spieler would be called as a witness as long as the Shroders remain class representatives. Since counsel was present at the closing, a court might be interested in analyzing the issue of "manufactured litigation." In analyzing wheth-

er to follow the strict wording of *Smith v. Chapman*, 614 F.2d 968 (5th Cir.1980) (strict versus punctilious compliance), a court may be interested and willing to learn what transpired at the closing. We recognize that so long as the Shroders serve as class representatives the remote possibility remains that class counsel may be called as a witness. The above-mentioned problems would not exist if any other members of the class served as named representatives.

The court in *Sicinski v. Reliance Funding Corp.*, 82 F.R.D. 730 (1979) found that where a class counsel is forced to be a witness, he cannot remain in the advocate position of counsel. If the Shroders remain as class representatives, the possibility remains that class counsel would have to be disqualified. This alone would be a sufficient ground for a court to conclude that Michael and Susan Shroder were inadequate representatives of the class. Other class members may serve as more proper class representatives.

er valid. *Fetta v. Sears, Roebuck and Co., Inc.*, 77 F.R.D. 411 (1977). "This argument is no longer a valid basis for denying certification as a class action in view of the 1974 amendment to the Act, Public Law 93–495, Title IV (October 28, 1974), Section 408." *Fetta*, 77 F.R.D. at 413. In *Sarafin v. Sears, Roebuck and Co., Inc.*, 73 F.R.D. 585 (1977), the court upheld class certification even though class members would receive less in a class action than they would have if they sued individually. The defendant in *Sarafin* urged the court to deny class representation by the named plaintiffs under rule 23(a)(4) due to the drastic reduction in the awards that all members would receive if the suit proceeded as a class action. The court stressed that if this argument was adopted by the courts, it would prevent certification in all Truth-in-Lending cases in which the class, although otherwise manageable, was too large. *Sarafin*, 73 F.R.D. at 588.

■ The district court, in denying class certification, correctly ruled that in this case a class action is not superior to other available methods for the fair and efficient adjudication of the controversy under Federal Rule of Civil Procedure 23(b)(3). The court stated that, "although technical violations of the complex TILA disclosure requirements are sufficient to establish the cause of action, the purpose of the Act is to insure compliance by creditors and not to punish an unwary violator." As the Shroders' attorney accurately points out in his brief, the trial court relied upon the *Watkins* decision for the proposition that some violations that are sufficient to sustain liability in an individual TILA action, may be too technical to form the basis for maintaining a class action under section 1640(a)(2)(B).

The *Watkins* decision is directly on point with the present case. Although it is a Sixth Circuit opinion, the rationale and holding clearly merit adoption by this court. In *Watkins*, the district court found in favor of the plaintiff, individually, yet, refused to certify the class, holding that the class action would not be superior to other available methods of adjudication. The court of appeals in *Watkins* affirmed the district court's denial of class certification on the grounds of superiority. The court of appeals in *Watkins* recognized that individuals could recover for TILA violations which were technical in nature, without any proof of actual monetary damage. In addition, the court recognized that Congress has clearly provided for and has tried to encourage class action suits under TILA. *Watkins*, 618 F.2d at 401. The court went on to hold, however:

> Congress did not intend by the 1974 and 1976 amendments, to make the certification of class actions mandatory in every Truth-in-Lending lawsuit. Courts which have considered the question have properly recognized the permissive rather than mandatory nature of class actions and that the determination whether to certify a class in the Truth-in-Lending context is still to be made on a case-by-case basis, bearing in mind the traditional prerequisites found in 23(a) and (b). *See Boggs v. Alto Trailer Sales, Inc.*, 511 F.2d 114 (5th Cir.1975); *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161 (7th Cir.1974). The question before us, then, is whether the district court abused its discretion in refusing to certify the class. *Watkins* at 402.

The district court in *Watkins*, in denying class certification on the grounds of lack of superiority, relied upon the fact that the defendant had submitted a revised installment sales contract to the court which was in compliance with the Act. The district court also noted that the violations in question were technical, without any actual damage being suffered by the plaintiffs. The court of appeals held that the district court did not abuse its discretion when it held that:

> If the purpose of the Act (and the 1974 amendment) in these cases of technical violations with no actual damages was to secure compliance with the Act's disclosure requirements rather than to punish the unheeding violator, then this court believes maintenance of the class action

(at least at this time) is an unnecessary overreaction to the violation here.

District Court Opinion, *Watkins*.

The appeals court in *Watkins* stressed that a district court does not abuse its discretion when it holds that a TILA class action is not superior to other available methods of adjudication based upon the fact that the violations in question were all technical, no actual damage was incurred by the plaintiffs, and no claim was made that the violations influenced the plaintiffs.

There are persuasive arguments which favor class certification even in cases involving technical violations. Were the certification issue before us *de novo* we may very well have certified the class. However, we cannot find an abuse of discretion on this record.

. . . .

We wish to state that class certification is desirable and should be encouraged. Where the requirements of F.R. Civ.Pro. 23(a) have been met, class certification should be denied only in a case involving technical violations and only where the district court, in the exercise of discretion, believes that certification is unwarranted. On the facts of this case, we can see no abuse of discretion.

*Watkins*, 618 F.2d at 404.

■ On the record now before this court, we cannot find an abuse of discretion by the district court when it denied class certification based upon the fact that this TILA class action was *not superior to* other available methods for the fair and efficient adjudication of the controversy under Federal Rule of Civil Procedure 23(b)(3). As in *Watkins*, the violations in the present case are technical in nature. No evidence was presented to indicate any actual damage incurred by the appellants, or that appellants were misled or influenced by the alleged discrepancies in the Truth-in-Lending disclosure statement. In addition, appellee's vice president testified at the hearing before the district court that since the filing of the lawsuit, the forms complained of had been discontinued and, along with other forms utilized by appellee, are being

reevaluated by its attorneys. We concur with the rationale of the *Watkins* decision that Congress did not intend by the 1974 and 1976 amendments to make certification of class actions mandatory in every TILA lawsuit. We hold that the district court did not abuse its discretion when it held that the TILA class action was not superior for the fair administration of justice in this case. Plaintiffs can recover when they are able to show technical violations of TILA. Although the technical violations may be sufficient to sustain liability in an individual action, we hold that in particular cases, these violations may be too technical to form the basis for maintaining a class action under TILA.

The district court did not abuse its discretion when it held that this TILA class action is not superior to other available methods for the fair and efficient adjudication of the controversy under Federal Rule of Civil Procedure 23(b)(3).

■ We disapprove of the denial of class certification under the theory that there was not a predominance of common questions of law and fact as required by 23(b)(3). The Shroders' have clearly shown that each of the 492 class members have received similar Truth-in-Lending disclosure statements. The fundamental basis of the class action is that the Truth-in-Lending disclosure statements are deficient. This underlying similarity between all class members would indicate an existence of predominant common questions of law and fact as required by 23(b). The district court stated that there were important factual questions which vary in the case of each class member. As the court stated, however, in *Dolgow v. Anderson*, 43 F.R.D. 472, 490 (E.D.N.Y.1968):

In spite of this abundance of common questions, defendants argue that each member of the class would have to prove reliance, compliance with the statute of limitations, and damages and thus the common questions cannot be said to predominate over those affecting individual members. To 'acknowledge defendants' position as this point would be, in effect,

an emasculation of the vitality and pliability of the amended rule. *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722, 727 (N.D.Cal.1967). The common issues need not be dispositive of the entire litigation. The fact that questions peculiar to each individual member of the class may remain after the common questions have been resolved does not dictate the conclusion that a class action is not permissible.

Though *Dolgow* did not deal with a TILA matter, we adopt the court's theory and apply it to the present Truth-in-Lending case. The fundamental foundation of this case is that the Truth-in-Lending disclosure statements given to all 496 class members were deficient. The deficient Truth-in-Lending disclosure statement creates predominant questions of law and fact among the various class members, as required by 23(b).

In conclusion, we hold that the district court correctly denied class certification based upon the fact that the representative parties would not adequately represent and protect the interests of the class (23(a)(4)), and the class action was not superior to other available methods for the fair and efficient adjudication of the controversy (23(b)(3)).

We now review the district court's granting of Suburban Coastal's motion for summary judgment, denial of the Shroders' motion for summary judgment, and the entry of final judgment in favor of Suburban Coastal. When this court reviews a case disposed of under Federal Rule of Civil Procedure 56, it must apply the same general standard as that initially employed by the district court: whether there is any genuine issue as to any material fact and whether the movant is entitled to judgment as a matter of law. *Bank of Commerce of Laredo v. City National Bank of Laredo,* 484 F.2d 284 (5th Cir.1973). In this case, we reverse the district court's final judgment and remand with directions to enter judgment in favor of the Shroders. We find that the Shroders are entitled to judgment as a matter of law with respect to

two of the four alleged violations of the Truth-in-Lending Act, 15 U.S.C.A. §§ 1601–1667e, and Regulation Z, 12 C.F.R. §§ 226.-1–226.1503. "Since any violation of the Act is sufficient to activate civil remedies of section 1640, it is clear that no matter how many violations are found in one loan transaction, only one recovery can be had and thus only one violation need be shown to trigger recovery." *Sneed v. Beneficial Finance Co. of Hawaii,* 410 F.Supp. 1135, 1138 (D.Hawaii 1976).

■ The Shroders allege that the Truth-in-Lending disclosure statement violates Regulation Z, 12 C.F.R. § 226.6(a), which states:

> Where the terms 'finance charge' and 'annual percentage rate' are required to be used, they shall be printed more conspicuously than other terminology required by this part and all numerical amounts and percentages shall be stated in figures and shall be printed in not less than the equivalent of 10-point type, .075 inch computer type, or elite size typewritten numerals, or shall be legibly handwritten.

The Shroders claim that the statement fails to print the term "annual percentage rate" more conspicuously than the other terminology required by the applicable provisions of the Consumer Credit Protection Act, in violation of section 226.6(a) of Regulation Z. The term "annual percentage rate" is printed in all capital letters and is italicized. The term "amount financed," however, which falls under the category of other terminology in section 226.6(a), is also printed in all capital letters and is italicized. The term "annual percentage rate" is conspicuously printed on the Truth-in-Lending disclosure statement. The fact, however, that the term "annual percentage rate" is printed conspicuously is not enough under section 226.6(a). The term must be printed more conspicuously than other terminology. Observation of the Truth-in-Lending disclosure statement reveals that the term "annual percentage rate" is not printed more conspicuously than all other terminology (i.e., amount fi-

nanced). Therefore, a violation of Regulation Z, Section 226.6(a) exists.

The district court relied extensively upon the Fifth Circuit decision in *Smith v. Chapman*, 614 F.2d 968 (5th Cir.1980). In *Chapman* we held that strict compliance does not necessarily mean punctilious compliance if, with minor deviations from the language described in the Act, there is still a substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation. *Chapman*, 614 F.2d at 972.

█ The district court's reliance upon the *Chapman* decision as support for its opinion is misplaced. The *Chapman* court stressed that the purpose of TILA is to promote the informed use of credit and an awareness of the cost thereof by consumers. The Act assures a meaningful disclosure of credit terms so that the consumers will be able to compare more readily the various credit terms available. The court went on to hold that the applicable standard is strict compliance with the technical requirements of the Act. Adherence to this strict compliance standard will promote the standardization of terms which will permit consumers readily to make meaningful comparisons of available credit alternatives. Even though we stated that strict compliance does not necessarily mean punctilious compliance, we went on to stress that this only means that courts should not "fly speck" the language of credit disclosures. *Chapman*, 614 F.2d at 972. We never stated nor intend to imply that it is unnecessary to make the disclosures in the proper technical form and in the proper locations on the contract, as mandated by the requirements of TILA and Regulation Z. Liability will flow from even minute deviations from requirements of the statute and Regulation Z. *Charles v. Krauss Co., Ltd.*, 572 F.2d 544 (5th Cir. 1978).

The Eleventh Circuit, in *Zamarippa v. Cy's Car Sales, Inc.*, 674 F.2d 877 (11th Cir.1982), stated that "as *Grant* holds in this specific context, the statutory civil penalties must be imposed for such a violation regardless of the district court's belief that no actual damages resulted or that the violation is de minimis." *Zamarippa*, 674 F.2d at 879.

We are not "fly specking" the language of the credit disclosures. In this case, a clear violation of section 226.6(a) exists. This is a clear, technical violation of Regulation Z, not a mere deviation. The required language is not printed more conspicuously than other terminology. Under the dominant Fifth and Eleventh Circuits case law, where a technical violation exists, liability must follow.

The Ninth Circuit, in *Dixey v. Idaho First National Bank*, 677 F.2d 749 (9th Cir.1982), held that where the terms "finance charge" and "annual percentage rate" were in bold-face type but other headings on the page also were in bold-face type, a violation of Truth-in-Lending Act's conspicuousness requirement occurred. The Ninth Circuit went on to hold that the violation was sufficient to entitle the borrowers to the statutory penalty. The court stressed that the terms "finance charge" and "annual percentage rate" are among the material terms affecting credit shopping and are protected by civil liability. Where the terms annual percentage rate and finance charge are not printed more conspicuously than other terminology on the Truth-in-Lending disclosure statement, the violation is a serious one which entitles the plaintiffs to recovery. *Dixey*, 677 F.2d at 752.

Since Suburban Coastal failed to print the term "annual percentage rate" more conspicuously than other required terminology, summary judgment should not have been granted for Suburban Coastal on this issue. *Powers v. Sims and Levin Realtors*, 396 F.Supp. 12, 19 (E.D.Va.1977).

Although under *Sneed* and *Zamarippa* a finding of this single violation is sufficient to entitle the Shroders to recover under TILA, we choose to examine the three other alleged violations of TILA.

█ The Shroders assert that the description of the prepayment penalty in the

disclosure statement materially differs from the terms of the note regarding the prepayment penalty, in violation of 12 C.F.R. §§ 226.8(b)(6) and 226.6(c). The key regulation provision is section 226.6(c), which states:

> *Additional Information.* At the creditor's or lessor's option, additional information or explanations may be supplied with any disclosure required by this part, but none shall be stated, utilized, or placed so as to mislead or confuse the customer or lessee or contradict, obscure, or detract attention from the information required by this part to be disclosed.

The note in question sets out certain requirements regarding the prepayment penalty for prepayment of the principal of the obligation. The note contains no provision regarding a thirty-day notice requirement. The Truth-in-Lending disclosure statement, however, specifically states that prepayment will only be permitted "upon giving thirty days notice prior to prepayment . . . ."

The court, in *Houston v. Atlanta Federal Savings and Loan Association*, 414 F.Supp. 851 (N.D.Ga.1976), examined a similar section 226.6(c) violation. In that case, as in this case, the expressed terms of the note conflicted with the terms of the Truth-in-Lending disclosure statement. The note provided that "any installment . . . due hereunder, or under the terms of said Security Deed, not . . . paid when due . . . shall be subject to a 'late charge' of four percent (4%) of the aggregate installment when paid more than fifteen days after the due date thereof." The Truth-in-Lending disclosure statement stated that "if the monthly installments are not paid when due, a late charge in the amount of four percent of the total required monthly payment will be charged." *Houston,* 414 F.Supp. at 855. The plaintiffs in *Houston* argued that the conflict between the disclosure statement and the note with respect to accrual of liability for the four percent "late charge" was misleading and confusing in violation of Regulation Z, 12 C.F.R. § 226.6(c).

This court has previously ruled that a disclosure statement which informs the consumer that the creditor claims a right he does not actually possess is 'confusing and misleading' and constitutes a Truth-in-Lending violation. . . . The disclosure statement, purporting to confer a nonexistent right to immediately collect the late charge conflicts with the terms of the note, is thus confusing and misleading, and violates the Act.

*Houston,* 414 F.Supp. at 856.

In this case, the disclosure statement purported to confer a nonexistent right upon the creditor. The disclosure statement attempted to require borrowers to give thirty days notice before prepayment. The note does not impose this thirty-day requirement upon borrowers. The disclosure statement, as written, conflicts with the terms of the note by adding this thirty-day requirement. The disclosure statement is confusing and misleading, and it is in violation of the Truth-in-Lending Act and Regulation Z.

We are not requiring that Truth-in-Lending disclosure statements mirror notes and mortgages. We are, however, requiring creditors to abide by section 226.6(c). We are requiring that creditors not mislead borrowers by adding confusing additional language in the Truth-in-Lending disclosure statements. The Truth-in-Lending Act is intended to assure "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him . . . ." *Chapman,* 614 F.2d at 971 (quoting 15 U.S.C.A. § 1601).

 .Where the statement in question has the capacity to mislead or confuse a potential borrower, a violation of 12 C.F.R. § 226.6(c) exists. *Weaver v. General Finance Corp.,* 528 F.2d 589 (5th Cir.1976).

> "The determination of what may or may not mislead, confuse, or detract attention is a judgmental factor, and a creditor providing additional information with the required disclosures should be prepared to justify his contention that the disclosures meet the section 226.6(c) require-

ments ... to the courts." F.R.B. Public Information Letter No. 832, [1974–1977 Transfer Binder] Consumer Credit Guide—Special Releases (CCH) § 31–154 (August 27, 1974) ... the disclosure of the "Other" charges "had the capacity to mislead or confuse a potential borrower." *Weaver v. General Finance Corp.*, 528 F.2d 589, 590 (5th Cir.1976) (per curiam). It provided information that was worse than meaningless: it said that the plaintiffs were subject to additional charges that in fact did not exist. *Wright v. Tower Loan of Mississippi, Inc.*, 679 F.2d 436, 444 (5th Cir.1982). The Shroders established a violation of section 226.-6(c). We reverse the district court's decision regarding this issue because the Shroders have established entitlement to judgment as a matter of law in regards to the section 226.6(c) violation.

We find that the final two claims of the Shroders are meritless. The Shroders first claimed that the Truth-in-Lending disclosure statement improperly itemized and excluded from the finance charge the charge imposed on the Shroders for recording the assignment of the Shroders' mortgage by Suburban Coastal to its assignee, in violation of Regulation Z, sections 226.-4(a)(8), 226.4(b), 226.4(e), and the Truth-in-Lending Act, 15 U.S.C.A. § 1605.

The courts have stated that such recording fees are properly excludable. Title 15 U.S.C.A. § 1605 specifically states that fees or premiums for title examination, title insurance, or similar purposes may be excluded from the finance charge. Under this provision, the fee for recording the assignment of the mortgage was properly excluded from the finance charge on the Truth-in-Lending disclosure statements. *George v. General Finance Corp. of Louisiana*, 414 F.Supp. 33 (E.D.La.1976). The fee for recording assignment of the mortgage was sufficiently itemized on the Truth-in-Lending disclosure statement. There was no lumping together of various fees under the heading "official fees." The item "recording fees" was broken down into deed, mortgage, and other. The

fee for recording assignment of the mortgage was entered under the item "other." The Truth-in-Lending disclosure statement itemizes and discloses the fee for recording the assignments under 15 U.S.C.A. § 1605(d) and Regulation Z, 12 C.F.R. § 226.4(b). This claim is meritless.

The Shroders' final claim is that there was an overstatement of the "net proceeds," in violation of 15 U.S.C.A. § 1639(a), which states:

Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer credit sale nor under an open end consumer credit plan shall disclose each of the following items, to the extent applicable: (1) the amount of credit of which the obligor will have the actual use, or which is or will be paid to him or for his account or to another person on his behalf.

Contrary to the Shroders' contention, we held that the $4 fee for recording the assignment of the mortgage was properly itemized and excluded from the finance charge.

Binding case law in support of the district court's determination of this fourth claim is found in the recent Eleventh Circuit en banc decision of *Sage v. Freedom Mortgage Co.*, 704 F.2d 1519 (11th Cir. 1983). In examining a net proceeds question similar to that raised by the Shroders, the en banc court affirmed the judgment of the district court granting summary judgment for the lender. We are bound by the *Sage* decision and, as such, will not here reexamine the net proceeds issue.

For the above reasons, we affirm the district court's decision denying class certification. As to the first two alleged violations of the Truth-in-Lending Act, we reverse that portion of the district court's order granting Suburban Coastal's motion for summary judgment and denying the Shroders' motion for summary judgment. We find that the Shroders, as a matter of law, are entitled to judgment in regards to (1) their claim that the disclosure of the term "annual percentage rate" was not made more conspicuously than the other

terminology required by the applicable provisions of the Consumer Credit Protection Act, in violation of Section 226.6(a) of Regulation Z, and (2) that the description of the prepayment penalty in the disclosure statement differs materially from the terms of the prepayment penalty in the note, in violation of Section 226.6(c) of Regulation Z.

As to these two issues, we reverse the district court's decision and order that judgment be entered for the Shroders. We remand the case to the district court for a determination of the proper monetary recovery for the Shroders.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

JAMES C. HILL, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's resolution of the class certification question. I cannot, however, agree that the lender here has violated the Truth-in-Lending Act. Therefore, I dissent.

I begin by emphasizing that nothing I write here is intended as less than full endorsement of the worthy aims of Truth-in-Lending. Nothing I write is intended as approval of calculated obfuscations by some lenders bent upon imposing unconscionable terms on unwary borrowers. My concern is that Congress undertook to create a clear crystal gem, but the administrators, regulators and adjudicators have carved so many facets upon the stone that its glitter now obscures its original beauty.

The Truth-in-Lending Act was written by a Congress with a beneficent purpose. Before this legislation became law, those consumers of credit who were unversed in the sophistry of money lenders were unable to shop around for the terms of credit best suited to their individual credit needs. Notes were complex, having been burdened with inkwells of legal jargon. Disclosure statements, now commonplace, were nonexistent. Even those familiar with the business of borrowing money were often hard pressed to decipher the terms of a particular credit transaction because of what was accurately labeled the "hidden costs of borrowing on time."

A wide range of deceitful lending practices was exposed and deplored in the seven years of hearings conducted by the Congressional committees considering the need for this legislation. The House Report accompanying the TILA cited "add on" rates, which were estimated to understate the true cost of credit by as much as fifty percent, and additional service fees and charges, which were added to the finance charge but not disclosed to the borrower, as causing "confusion in the public mind about the true costs of credit." H.Rep. No. 1040, 90th Cong., 2d Sess. 2 (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 1962, 1970. Senator Sullivan, the principal sponsor of the bill that became Truth-in-Lending, spoke of the need to protect the credit industry against "unfair and dishonest competition from an unscrupulous minority engaging in practices which too often discredit credit and dishonor its ethics." *Id.* at 1999–2000.

Congress reacted to these recognized inequities by passing the Truth-in-Lending Act. The Act's purpose was stated in clear terms:

The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a) (1976).

However, somewhere between the Act's statutory provisions, the Federal Reserve Board's implementing regulations and the federal judiciary's varying interpretations,

TILA's aim of "meaningful disclosure" has been lost. Congress, I submit, might have recently examined the TILA and quite rightfully lamented, "I beheld the wretch—the miserable monster whom I have created." [1] But unlike the fallen Doctor Frankenstein, Congress cannot accept the entire blame for this aberration. The Federal Reserve Board and the federal bench have supplied a good deal of mangled flesh to Congress' creation. The present case dramatically illustrates the ugly results that can obtain in TILA litigation.

The "unwary" credit consumers suing here are Dr. Michael Shroder, a member of the learned profession of medicine, his wife, and Gregory Pillon, a title examiner in the law offices of Gregg Spieler. Gregg Spieler is an attorney seeking to represent all of the above and many more like them. What the Shroders and Mr. Pillon have in common, other than their choice of attorneys, can only be described as a lack of unsophistication. Mr. Shroder presumably spent several years in college and postgraduate study learning to analyze sources of information that are much more complex than the disclosure statement contested here. Mr. Pillon, as a title examiner in a law office, has probably achieved a high degree of sophistication in the review of materials similar to the document he now challenges in the course of his duties.

Mr. Spieler's role in this case is interesting. As the attorney who represented the Shroders when they closed the transaction, Spieler reviewed the note securing the mortgage and the disclosure statement accompanying the note. Since the Shroders signed the note, Spieler must have been satisfied with the information provided by the disclosure statement. Certainly, he voiced no objections either before or at the time of the closing. Too, Spieler's relation-ship with Pillon invites serious questions that touch not only upon the issue of class representation but also upon the notion of manufactured litigation. Pillon is the title examiner in Mr. Spieler's law office.

These parties, through attorney Spieler, claim that the disclosure statement provided them by Suburban Coastal fails to comply with the TILA in several respects. The majority finds two violations: (1) the terms "finance charge" and "annual percentage rate" are not printed "more conspiciously than other terminology" required by the statute, a violation of Regulation Z, 12 C.F.R. § 226.6(a); and (2) the disclosure statement "discloses" a requirement of thirty days notice of prepayment of the principal, whereas the note sets no notice requirement, a violation of Regulation Z, 12 C.F.R. § 226.6(c). Although it describes the violations as "technical," [2] the majority concludes, as it must, once it finds a violation, that the lender is subject to the full panoply of remedies afforded the "unwary" by the Act.

If we are to take the plaintiff's microscopic view of this disclosure statement, then surely it is not inappropriate that we use a similar instrument when reading the statutory language that is said to have been violated. Regulation Z, 12 C.F.R. § 226.6(a), provides that two terms, "finance charge" and "annual percentage rate," "shall be printed more conspiciously than other terminology required by this part ...." Section 226.6(a) does not require that those two terms be printed more conspiciously than *all* other required terminology. It merely requires the terms to be "more conspicious than other terminology," a requirement that I find to be satisfied. The terms *are* in fact more conspicious than other required terminology—*e.g.*, "finance charge" is more conspicuously print-

---

**1.** Mary Wollstonecraft Shelley, *Frankenstein*, ch. 5.

**2.** I am here reminded of a ruling that Judge J. Wilson Parker once made from the bench after I, then a young lawyer trying my first case, objected to his decision to grant my opponent a new trial. I complained that Judge Parker was resting his decision on a mere technicality. His ruling remains with me now: "Mr. Hill," he said, "a technicality is a rule of law upon which you lose. Should you win, it then becomes a cornerstone of American justice!" Even Judge Parker, I venture, would scoff at the "hypertechnical" nature of the TILA violations found in this case.

ed than "charges excludable from the finance charge," a term required by 12 C.F.R. § 226.4(c) and "annual percentage rate" appears more conspicuously than "total of payments," a term required by 12 C.F.R. § 226.8(b)(4).[3]

My point is this: section 226.6(a) imposes no all-inclusiveness requirements on the "more conspicuous" provisions, although clearly the Federal Reserve Board could have written in just such a requirement. By not doing so, the Board left the provision ambiguous. I am unwilling to construe that ambiguity so as to find a violation where, as here, substantial, meaningful disclosure has been achieved and no "unwary" consumer has been misled.

The second violation found by the majority concerns the thirty-day notice of prepayment provision included in the disclosure statement but not required by the note. Of course, the borrower cannot be bound by the notice requirement since it was not made part of the note. Thus, the lender has advertised that its credit terms are, if anything, *less attractive* than those actually available.[4] Given the choice between two offers of credit that are otherwise indistinguishable, the consumer might reject this lender's note because the disclosure statement indicates a notice requirement not found in the other agreement. The lender's error, it seems, lies in its failure to duplicate the terms of the note in its disclosure statement, not in a desire "to mislead or confuse ... or contradict, obscure, or detract attention from information required ... to be disclosed." 12 C.F.R. § 226.6(c).[5]

The distinctions I have drawn are valid, if at all, for one reason. TILA litigation is becoming a game of "gotcha," with the "unwary" credit consumer (or his attorney) holding many wild cards, the "sophisticated" money lender holding more rules and regulations than guiding instructions, and the "hypertechnical" federal bench holding up its hands in submission. The courts have quite rightfully, I believe, allowed private attorneys general to police the Act by bringing suits challenging insufficient disclosures. We have approved the desirability of class actions in TILA litigation and imposed sanctions where only one violation could be shown. None of this, however, dictates our countenancing the game of "gotcha" into which TILA is in danger of degenerating.

The "gotcha" game is giving us disclosure statements that, in seeking compliance with Regulation Z, are no more useful to credit consumers, wary or unwary, than the credit agreement itself. A quick perusal of the statement challenged here [6] would hardly supply an ordinary consumer with the information necessary to test the credit

---

3. The Federal Reserve Board, had it desired to do so, could have written Regulation Z as the majority today reads it. By itself, however, the phrase "more conspicuous than other terms" is inherently ambiguous. Indeed, the more common usage of "other" when modifying a plural subject (as in "other terms") would indicate distinction from some, but not all items listed.

An example serves to illustrate. A judge is contacted by a law firm seeking information about one of the judge's clerks who has applied for a job with the firm. By responding that "this clerk is more knowledgeable than other clerks I have had," the judge does not necessarily indicate that the clerk is more knowledgeable than *all* other clerks he has employed. In fact, had the judge meant that the clerk was more knowledgeable than all other previous clerks, he would have said so and thereby enhanced his clerk's chances of being offered the job.

4. Which of us would complain if, upon reading an advertisement featuring a 1970 Chevrolet with 80,000 miles for $1500, we went to see the

car and discovered its true mileage to be 8,000 miles but its selling price remained at $1500?

5. Since Congress intended to promote the informed use of credit, it is appropriate to develop rules that consider whether disclosures in fact allow consumers to shop around. No one argues that the violations charged here hindered these buyers from doing just that.

I would thus disapprove of those district court decisions, cited by the majority, holding that "a disclosure statement which informs the consumer that the creditor claims a right he does not actually possess is confusing and misleading and constitutes a Truth-in-Lending violation," *e.g., Houston v. Atlanta Federal Savings and Loan Association*, 414 F.Supp. 851, 856 (N.D.Ga. 1976), where the "inaccurate" disclosure makes the credit terms advertised *less attractive* than those actually available under the note.

6. A copy of the disclosure statement is attached as Appendix A.

**1386**

market, but not because the disclosure is somehow inadequate. Rather, the inadequacy lies in the overload of information said to be required by Regulation Z[7] and the various forms the information must take in order to meet Regulation Z's exacting standards. Ironically, the borrower fleeing from the obfuscation of the promissory note is offered haven in the obscure complexity of the disclosure statement.

Congress recently voiced its disapproval of the "gotcha" game by enacting the Truth-in-Lending Simplification and Reform Act, Pub.L. No. 96–221, Title VI, 94 Stat. 168 (1980).[8] The Senate Committee Report accompanying the Simplification Act extolled the substantial benefits that followed passage of the original Act, but the Committee members could not ignore its shortcomings:

> Despite the act's clear successes, however, there is a growing belief among consumers and creditors alike that the act could be substantially improved. There is considerable evidence, for example, that disclosure forms given consumers are too lengthy and difficult to understand. Creditors, on the other hand, have encountered increasing difficulty in keeping current with a steady stream of administrative interpretations and amendments, as well as highly technical judicial decisions. There is also evidence that many creditors have sincerely tried to comply with the act but, due to its increasing complexity and frequent changes, have nonetheless found themselves in violation and subject to litigation. In addition, this committee and other congressional and government sources

have found the level of administrative enforcement by the Federal bank agencies seriously inadequate. In short, the committee believes that the interests of both consumers and creditors would be furthered by simplification and reform of the act.

S.Rep. No. 96–368, 96th Cong., 2d Sess. 2 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 236, 252.

The Supreme Court has voiced similar criticisms in recent years. For instance, in upholding the Federal Reserve Board's view that the TILA does not uniformly require a lender to disclose the existence of an acceleration clause on the face of a credit agreement, the Court emphasized that, *"Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure ... and the need to avoid ... [informational overload].' " *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980) (citations omitted) (emphasis in original); *see also Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 159, 101 S.Ct. 2239, 2241, 68 L.Ed.2d 744 (1981) (rejecting as "formalistic" rule requiring disclosure of credit assignee's status as "creditor" where buyer notified of assignment of credit). This circuit, though no less guilty of rendering the "highly technical judicial decisions" criticized by those in Congress who reviewed the Simplification Act, has also spoken against the "flyspecking" that pervades TILA litigation. As Judge Brown wrote,

> Strict compliance does not necessarily mean punctilious compliance if, with mi-

7. In 1979, the year in which these alleged violations occurred, Regulation Z covered 108 pages in the Code of Federal Regulations and used approximately 75,000 words to implement Truth-in-Lending's aim of "meaningful disclosure." *See* 12 C.F.R. §§ 226.1–226.1503 (1979). Too, the Federal Reserve Board had issued 119 pages of staff interpretations of Regulation Z, adding about 80,000 words in explanation of that regulation. *See* 12 C.F.R.App. 591–710. In all, then, approximately 155,000 words described the lender's duty to provide consumers with "meaningful disclosure" of credit terms. (To put that figure in perspective, we note that the King James version of the New Testament contains 181,258 words. E. Edwards, *Words, Facts,*

*and Phrases; A Dictionary of Curious, Quaint, & Out-of-the-Way Matters* 58 (1968)).

The voluminousness of Regulation Z does not, of course, excuse a lender's failure to comply with requirements clearly imposed by that regulation. However, the enormity of the burden placed on lenders that, in all good faith, attempt compliance does shed some light on the reasons for the profusion of litigation involving alleged "technical" violations of the Act.

8. The Simplification Act became effective March 31, 1982, some three years after the credit transactions challenged here took place.

nor deviations from the language described in the Act, there is still a substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation.

*Smith v. Chapman,* 614 F.2d 968, 972 (5th Cir.1980).

In this case, the lender made a "substantial, clear disclosure" of the required terms. Anyone desiring to shop for credit could have easily determined the amount of the "finance charge" and the "annual percentage rate." The thirty-day notice provision stated in the disclosure form only hurt the lender's chances of securing the borrower's business, it did not prevent anyone from credit shopping.

In spite of the admonition in *Smith v. Chapman,* appellants urge punctiliousness upon us. We cannot examine only the disclosure statement with such precision; similar precise reading of the regulation results in a finding that the statement complies.

## APPENDIX A

NOTICE TO CUSTOMERS REQUIRED B FEDERAL LAW
FEDERAL RESERVE REGULAT...] Z
REAL PROPERTY TRANSACTION - PURCHASE LOAN
SECURED BY FIRST LIEN ON A DWELLING

SUBURP \COASTAL CORP.
CONVEN .JNAL
SCC LOAN NO. 06-3209064

1. The *AMOUNT OF THE LOAN* in this transaction is $ 52,400.00
The *FINANCE CHARGE* on this transaction will begin to accrue on ___October 15, 1979___ .
2. Less the *PREPAID FINANCE CHARGE* on this transaction which includes:

| | | | |
|---|---|---|---|
| LOAN ORIGINATION FEE | $ 524.00 | APPRAISAL FEE | $ |
| LOAN DISCOUNT | $ 524.00 | PHOTOS | $ |
| MORTGAGE GUARANTY INSURANCE | $ | | $ |
| INTEREST FROM: 10/15 TO: 10/31 | $ 252.64 | *TOTAL PREPAID FINANCE CHARGES* | $ 1,300.64 |

3. Equals the *AMOUNT FINANCED* in this transaction $ 51,099.36 This amount includes:

| | | | |
|---|---|---|---|
| LOAN AMOUNT (GROSS) | $ 52,400.00 | | $ |
| LESS: PREPAID *FINANCE CHARGES* | $ 1,300.64 | *NET PROCEEDS* | $51,099.36 |

4. The *FINANCE CHARGE* consists of $ 128,673.84 . This amount includes the following:

| | | | |
|---|---|---|---|
| PREPAID *FINANCE CHARGE* - | $ 1,300.64 | | $ |
| TOTAL INTEREST | $ 17,373.20 | | $ |
| TOTAL MORTGAGE INSURANCE PREMIUM | $ | | $ |

5. The *ANNUAL PERCENTAGE RATE* on this transaction is 11.25 %.
6. Itemized CHARGES EXCLUDABLE from the *FINANCE CHARGE* in this transaction:

| | | | | |
|---|---|---|---|---|
| APPRAISAL FEE | $ 100.00 | FLOOD INSURANCE: DOWN PAYMENT | | $ |
| CREDIT REPORT | $ 14.50 | : ESCROW | | $ |
| TITLE INSURANCE | $ 475.00 | RECORDING FEES: | DEED | $ 4.00 |
| PEST INSPECTION | $ | : | MORTGAGE | $13.00 |
| SURVEY | $ 75.00 | : | OTHER | $ 4.00 |
| CLOSING AND DISBURSEMENT FEE | $ | DOCUMENTARY STAMPS | | $78.60 |
| HAZARD INSURANCE: DOWN PAYMENT | $ 315.00 | INTANGIBLE TAX | | $104.80 |
| : ESCROW | $ 52.50 | | | $ |

7. Payments for principal and interest on this transaction shall be 360 monthly installments of $ 499.37 beginning on the 1st day of December 19 79 and due on the first day of each month thereafter. In addition, added as part of this monthly payment as a *FINANCE CHARGE* will be monthly Mortgage Guaranty Insurance payment which results in the borrower making the following monthly payments of principal and *FINANCE CHARGE*:

___ payments of $___ with the first payment due ___ 19___
___ payments of $___ with the first payment due ___ 19___
___ payments of $___ with the first payment due ___ 20___

The total of payments is $ 179,773.20 .

8. This institution's security interest in this transaction is a first mortgage on property located at 35 N.E. 91st Street, Miami Shores, Florida 33138 also specifically described in the documents furnished for this loan. The documents executed in connection with this transaction cover all after-acquired property and also stand as security for future advances, the terms for which are described in the documents.

9. Late Payment Formula, in accordance with Section 226.8 (b)(4): In the event of late payment, a late charge equivalent to 4% of each payment more than fifteen (15) days in arrears must be paid by Borrower to Lender. A default Borrower is liable for Mortgagee's attorney fees, legal expenses and foreclosure costs.

10. Prepayment Formula, in accordance with Section 226.8 (b)(6): Borrower may prepay the debt in whole or in an amount equal to one or more monthly payments on principal net due, on the first day of any month prior to maturity, upon giving thirty days notice prior to prepayment with possible premium charge of 5.5% of the amount of principal so prepaid if paid during the first three (3) loan years: 3.00% if paid during the ensuing two (2) years.

11. Rebate Formula, in accordance with Section 226.8 (b)(7): No rebate in event of voluntary prepayment.

1388

INSURANCE

12. PROPERTY INSURANCE: If written in connection with this loan, may be obtained by borrower through any person of his choice. If borrower desires property insurance to be obtained from or through the creditor, the cost will be $_____ for the _____year term of the initial policy.

13. OTHER INSURANCE: Credit Life, Accident, Health or Loss of Income Insurance is NOT required to obtain this loan. No charge is made for such insurance and no such insurance is provided unless the borrower signs the appropriate statement below.. _____ is available at a cost of $_____ for the _____ year term of the initial policy. ·

I desire _____insurance coverage. I DO NOT desire such insurance coverage.

| DATE | SIGNATURE | DATE | SIGNATURE |
| --- | --- | --- | --- |
| TOWN & COUNTRY TITLE GUARANTY & ESCROW, INSTITUTION INC. | Title | I HEREBY ACKNOWLEDGE RECEIPT OF THE DISCLOSURES MADE IN THIS NOTICE. | |
| S/ Teresa Keith | Processor | S/ Michael Shroder | 10/15/79 |
| BY | TITLE | CUSTOMER | DATE |
| 10/15/79. | | S/ Susan Shroder | 10/15/79 |