In re Elizabeth Marie BROWN, Debtor.

Elizabeth Marie BROWN and Edward R. Sparkman, Trustee, Plaintiffs,

v.

CREDITHRIFT OF AMERICA CONSUMER DISCOUNT CO., Defendant.

Bankruptcy No. 89–10978S.
Adv. No. 89–0484S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 7, 1989.

es subject matter jurisdiction to decide the debtor's pending § 365 motion.

**853**

were apparently all that were considered necessary by Congress to remedy any inequities in favor of consumers arising from litigation under the TILA as originally enacted. Therefore, we believe that it is incumbent upon courts to preserve the concept which has been well-established since the enactment of the original TILA that the full remedies provided by the TILA must be accorded to consumers subjected to even technical violations of that Act. This is particularly true when Congress has reduced the technical burdens of disclosure by "simplifying" same.

The instant proceeding requires us to consider the principles set forth in the foregoing paragraph. It involves a claim of a rather technical violation of a provision of the new Reg. Z which itself "simplified" the prior law. However, the particular violation alleged—an attempt to exclude from the disclosed finance charge in the transaction the official fee for the recording, by a finance company, of an assignment of a mortgage taken by the original creditor—appears to us to be a violation under the specific wording of "simplified" Reg. Z. Therefore, we conclude that the creditor under-disclosed the finance charge and became subject to the rather harsh consequences of a valid rescission which the creditor refused to honor. The creditor is hence left with an unsecured claim reduced to $1,566.15 and a liability of $1,000 to the Debtor plus attorneys' fees for her counsel for failing to honor her valid rescission.

Susan L. DeJarnatt, Community Legal Services, Inc., Philadelphia, Pa., for debtor/plaintiff.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee and plaintiff.

William M. Marutani, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for defendant.

Max A. Wernick, Dallas, Tex., David B. Comroe, Philadelphia, Pa., for Lomas Mortg. USA.

Andrew L. Markowitz, Lahaska, Pa., for Chrysler First Consumer Discount Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION.

In 1980, Congress, in certain respects, eased the burdens of disclosure placed upon creditors by the federal Truth–in–Lending Act of 1968, 15 U.S.C. § 1601, *et seq.* (hereinafter "the TILA"), by enactment of the Truth–in–Lending Simplification and Reform Act, P.L. No. 96–221, Title VI. Thereafter, amendments which had the same effect of reducing certain aspects of the creditor's disclosure burdens were made to the TILA Regulations, 12 C.F.R. § 226.1 et seq., known as Regulation Z (hereinafter "Reg. Z"). These amendments

### B. PROCEDURAL HISTORY.

The Debtor, ELIZABETH MARIE BROWN, filed a voluntary petition for relief under Chapter 13 of title 11, United States Code, on March 16, 1989. Since filing her petition, the Debtor has filed four (4) separate adversarial proceedings against her several secured creditors. Two of these actions have invoked 11 U.S.C. §§ 506(a), (d), and recoupment claims under TILA in attempting to reduce the asserted secured claims of these creditors against her.[1] The third of these proceedings,

1. These proceedings are Adversary No. 89– 0953S, instituted against Chrysler First Consum-

which was settled by an approval of a Stipulation of September 8, 1989, effected elimination of the secured claim entirely by invocation of the rescission sections of the TILA, 15 U.S.C. § 1635, and its accompanying provision of Reg. Z, 12 C.F.R. § 226.23.[2]

The need to resolve these proceedings has caused us to continue the confirmation hearing in the main case until November 21, 1989. Since the two § 506 recoupment proceedings are not listed for trial until December 5, 1989, a further postponement of the confirmation is regretfully necessary. We shall, however, use our best efforts to bring the pre-confirmation administration of this case to a prompt conclusion by December 5, 1989, through the medium of our accompanying Order.

This particular adversary proceeding was filed by the Debtor against CREDITHRIFT OF AMERICA CONSUMER DISCOUNT CO. (hereinafter referred to as "Credithrift") on June 2, 1989. The Complaint asserted Counts under both § 506 (Count I) and the rescission sections of the TILA and Reg. Z (Count II). The Debtor advises that a ruling in her favor on the TILA rescission aspect of her Complaint will render consideration of the § 506 aspect of it unnecessary because Credithrift's entire lien against her property would then be invalidated.

After a court-approved extension of time to file its response, Credithrift filed an Answer to the Complaint on July 18, 1989. The trial was continued three times before it was scheduled on September 28, 1989. On that date, the parties agreed to submit the matter by filing (1) A Stipulation of Facts which would constitute the record by October 2, 1989; and (2) Briefs in support of their positions by October 2, 1989 (the Debtor), and October 23, 1989 (Credithrift). The Briefs were timely filed, although the

Stipulation of Facts was filed on October 3, 1989, and a Supplemental Stipulation of Facts was not filed until October 12, 1989. The following recitation of facts is taken from the Stipulation of Facts and exhibits thereto provided by the parties.

## C. UNDERLYING FACTS.

The genesis of the Debtor's obligation to Credithrift was a contract between Philadelphia Builders & Remodeling Co. (hereinafter referred to as "Builders") and the Debtor dated August 24, 1985 (hereinafter the "Agreement"), which was subsequently assigned to Credithrift. Pursuant to the Agreement, the Debtor agreed to purchase, and Builders agreed to provide on credit, certain repairs to the Debtor's home, situated at 5614 Pemberton Street, Philadelphia, Pennsylvania 19142, including supplying a steel door and eight (8) windows, and labor to install same. As security for the credit provided, Builders took a mortgage on the Debtor's home. The $3,355 alleged "amount financed" was to be paid, in addition to a disclosed finance charge of $1,341.20, in sixty (60) installments of $78.27, totalling payments of $4,696.20.

We infer that the Agreement was a form supplied by Credithrift because the Agreement, though between Builders and the Debtor, was embossed with Credithrift's name in the top lefthand corner. On the third page of the Agreement, in a box separate from the other provisions of the Agreement, is an assignment of Builders' rights under the Agreement to Credithrift. The Debtor is not a party to the assignment, which is signed only by Builders. The assignment is accompanied by a conspicuous notation which clearly states that the assignment "is not part of the Buyer's [Debtor's] agreement." Obviously, Builders used Credithrift's form credit agrement to close its transaction with the Debtor with the intention, from the beginning, of transferring its interests in the Agreement to Credithrift.

er Discount Co. and Adversary No. 89–0960S, instituted against Lomas Mortgage USA. These proceedings were filed on October 16, 1989, and October 19, 1989, respectively.

**2.** This proceeding, Adversary No. 89–0511, was filed against Beneficial Consumer Discount Co.

Among the fees charged to the Debtor, excluded from the "finance charge" in the transaction and included instead in the "amount financed," was an item referenced on the Agreement as "AMOUNTS PAID TO OTHERS ON YOUR BEHALF ... TO PUBLIC OFFICIALS $60.00." Although the Agreement does not break down this item any further, Credithrift now states that this item includes three separate charges: $20.00 for Builders' recording of the mortgage on the Debtor's principal residence; $25.00 for recording the assignment of the mortgage from Builders to Credithrift; and $15.00 which is being held in reserve to pay for the ultimate satisfaction of the mortgage.

At the same time that the Debtor and Builders entered into the Agreement, the Debtor was given a "Notice of Cancellation" informing her of her right to cancel the transaction with Builders. *See* 15 U.S.C. § 1635, 12 C.F.R. § 226.23. Credithrift's name did not appear on the Notice of Cancellation. Also, on August 24, 1985, the Debtor received a "Notice of Right to Cancel" which, in greater detail than the Notice of Cancellation, again explained to the Debtor her right to cancel the transaction and the procedure for doing so. Builders was listed as the "creditor/lender" on the Notice of Right to Cancel.

On October 24, 1985, the Debtor signed a Certificate of Completion stating that all goods and services required to be supplied under the Agreement by Builders were in fact satisfactorily supplied and that she had not exercised her right to rescind the Agreement. Builders simultaneously executed a Contractor's Certificate stating that all goods and services were provided as required and that the Debtor had received notice of her right to rescind the Agreement and had chosen not to do so.

Although the Agreement contains what appears to be a contemporaneous assignment of the Agreement and the mortgage to Credithrift by Builders, a separate Assignment of Mortgage, dated October 24, 1985, was executed by Builders in favor of Credithrift assigning Builder's mortgage on the Debtor's residence to Credithrift. On November 21, 1985, the mortgage as well as the assignment of the mortgage were recorded in the Philadelphia County Recorder of Deeds Office. The fees for filing these documents, as indicated above, were $20.00 for the mortgage and $25.00 for the mortgage assignment.

By letter dated August 10, 1988, the Debtor, through her counsel, sent a notice to Credithrift rescinding the credit transaction. The Debtor's demand for rescission was based upon Credithrift's alleged failure to provide the Debtor with "all of the material disclosures required by TILA, including but not limited to inaccurate disclosures of the Finance Charges and Amount Financed." By a second letter to Credithrift dated August 25, 1988, Debtor's counsel explained that "the charge for recording the assignment of the mortgage should have been included in the Finance Charge rather than the Amount Financed in the TILA disclosure materials provided" to the Debtor. In response to the Debtor's letters, Credithrift, by letter dated December 5, 1988, refused to rescind the transaction and stated that § 226.4(e) of Reg. Z specifically allowed all of the fees paid to public officials in issue for perfecting a security interest to be excluded from the finance charge. The parties agree that, as of November 18, 1987, the balance due and owing Credithrift from the Debtor under the Agreement was $2,922.35. Hence, the Debtor has paid the difference between the $4,696.20 total payment and this figure, or $1,773.85.

The parties agree that the sole legal issue presented in this proceeding is whether the credit agreement recitation of "TO PUBLIC OFFICIALS $60.00" is sufficient to allow the exclusion of this sum from the finance charge in the transaction or whether the failure to disclose this figure as part of the finance charge in the transaction constitutes a "material violation" of the disclosure requirements of the TILA and Reg. Z, justifying the Debtor's asserted right of rescission.

D. PRIOR TO THE AMENDMENTS TO THE TILA AND REG. Z IN 1980, NUMEROUS AUTHORITIES HELD THAT (1) A FAILURE TO ITEMIZE OFFICIAL FEES AND CHARGES WERE TECHNICAL BUT VIABLE TILA VIOLATIONS; AND (2) A SELLER'S ALLOWANCE OF A LARGE DISCOUNT TO A FINANCE COMPANY UPON ASSIGNMENT OF ITS CONTRACT TO THE FINANCE COMPANY CONSTITUTED A "HIDDEN FINANCE CHARGE."

The TILA, at 15 U.S.C. § 1605(a), defines a "Finance Charge" as follows:

Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.

At 15 U.S.C. § 1605(d)(1), the TILA goes on to "otherwise provide" the following:

If any of the following items is itemized and disclosed in accordance with the regulations of the Board in connection with any transaction, then the creditor need not include that item in the computation of the finance charge with respect to that transaction:

(1) Fees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the credit transaction....

Two lines of cases developed under the "original" TILA which are relevant both to these provisions and the evolution of the specific provision of "simplified" Reg. Z in issue here. The first line is a group of cases holding that, to be excludable from the finance charge, each component of any official charges must be itemized in detail and may not be combined with other charges in a single "categorized" disclosure. *See, e.g., Gallegos v. Stokes,* 593 F.2d 372, 374 (10th Cir.1979) (failure to itemize and separately disclose the license, certificate of title, and registration of fees is a violation of TILA); *Meyers v. Clearview Dodge Sales, Inc.,* 539 F.2d 511, 517–19 (5th Cir.1976), *cert. denied sub nom. Chrysler Credit Corp. v. Meyers,* 431 U.S. 929, 97 S.Ct. 2633, 53 L.Ed.2d 245 (1977) (failure to individually itemize tag, title, and other fee charges constitutes a violation of TILA); *Grant v. Imperial Motors,* 539 F.2d 506, 510 (5th Cir.1976) (failure to itemize the license, certificate of title, and registration fees separately and instead disclosing them as "official fees" is a violation of TILA); *Smith v. Lewis Ford, Inc.,* 456 F.Supp. 1138, 1144 (W.D.Tenn.1978) (license, title and registration fees imposed in connection with the sale of an automobile should have been individually and separately itemized rather than listed under the heading "License and/or registration"); *Desselles v. Mossy Motors, Inc.,* 442 F.Supp. 897, 899–90 (E.D.La.1978) (disclosure of $3.50 certificate of title charge and $1.00 recordation fee as a $4.50 "certification of title" fee and disclosure of a $6.00 charge for a permanent license and $1.00 for temporary tags as $7.00 for "license and/or registration fees" are insufficient itemizations); and *Young v. Ouachita National Bank,* 428 F.Supp. 1323, 1325–26 (W.D.La.1977) (disclosure of $14.50 as "official fees" is an insufficient disclosure; each component of the official fees must be itemized).

It is clear that the violations which were held to be actionable in this line of cases were extremely technical. The customers had received disclosure of the fees and charges imposed by law and the only perceived violations were failures to break down what were often very small charges into greater detail. However, application of the principle that "once the court finds a violation, no matter how technical, it has no discretion with respect to liability," *Grant, supra,* 539 F.2d 510, resulted in liability being imposed upon creditors in these cases.

The Third Circuit Court of Appeals, while not addressing any of the "itemization of fees" issues raised by the foregoing cases, recently recited with approval the above

quotation from the *Grant* case regarding the imposition of liability as the result of merely technical TILA violations. *Smith v. Fidelity Consumer Discount Co.*, Nos. 88–1406 & 88–1444, slip op. at 4, 1989 WL 106695 (3d Cir. June 27, 1989). The principle that even technical TILA violations give rise to liability is also expressed in other decisions of the Court of Appeals, *e.g., Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 250 (3d Cir.1980); and *Gennuso v. Commercial Bank & Trust Co.*, 566 F.2d 437, 440–41 (3d Cir.1977).

As we previously observed in *In re Russell*, 72 B.R. 855, 861–62 (Bankr.E.D.Pa. 1987), this strict interpretation of the TILA has largely been responsible for the TILA's success in achieving widespread compliance with its requirements. *Accord, Nichols v. Mid–Penn Consumer Discount Co.*, C.A. No. 88–1253, slip op. at 4–6, 1989 WL 46682 (E.D.Pa. April 28, 1989). It therefore is plain that this principle remains intact even in light of the amendments which have "simplified" the TILA.

The second line of cases concerned practices of certain creditors, notably health spas, who sold memberships to customers at a certain disclosed price, and then proceeded to assign these contracts to lending institutions at substantial discounts. In several of these cases, courts concluded that the "deep discounts" accorded to the lending institutions were effectively finance charges which, not having been disclosed to the customers, were held to be "hidden finance charges." *See Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86, 93–94 (8th Cir.1976); *Kriger v. European Health Spa, Inc.*, 363 F.Supp. 334, 336–38 (E.D.Wis.1973); and *Glaire v. LaLanne–Paris Health Spa, Inc.*, 12 Cal.3d 915, 528 P.2d 357, 358–60, 117 Cal.Rptr. 541, 542–44 (1974).

It is also clear that the TILA violations perceived in this second line of cases were extremely subtle. The actual cost of the health spa service was disclosed to the customer. It could certainly be argued that the terms upon which the spas assigned their contracts to finance companies were entirely irrelevant to the accuracy of the disclosures of the respective spas' actual costs which they provided to the customers. What the courts seemed to be concerned about was the pricing of the spas' services which, while possibly unconscionable, would not, for that reason, have been violative of the TILA. *But see In re Stewart*, 93 B.R. 878, 882–86 (Bankr.E.D.Pa.1988) (charges imposed by a seller which are related solely to the credit terms offered by the seller are "hidden finance charges" which cannot be excluded from the finance charge).

E. THE AMENDMENTS TO THE TILA EFFECTED BY THE CHANGES IN REG. Z AND CERTAIN CLARIFICATIONS OF THE FOREGOING PROVIDED BY OFFICIAL STAFF COMMENTARY OF TILA OVERRULED THE FOREGOING LINES OF CASES.

Although 15 U.S.C. §§ 1605(a) and (d)(1) were not changed in the TILA "simplification" process, the "regulations of the Board" referenced in § 1605(d)(1) were, at that time, changed quite substantially. Replacing the former version of Reg. Z, 12 C.F.R. §§ 226.4(b), (e), which pretty much parroted the statute, were the following new provisions of 12 C.F.R. § 226.4:

(b) Examples of finance charges. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

.    .    .    .    .

(6) Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

.    .    .    .    .

(e) Certain security interest charges. If itemized and disclosed, the following charges may be excluded from the finance charge:

(1) Taxes and fees prescribed by law that actually are or will be paid to public officials for determining the existence of

or for perfecting, releasing, or satisfying a security interest. . . .

Included in a new body of interpretive material, the Official Staff Commentary on Regulation Z Truth-in-Lending, was the following gloss upon 15 U.S.C. § 1605(d) and 12 C.F.R. § 226.4(e), at ¶ 226.4(e)2:

> 2. Itemization. The various charges described in section 226.4(e)(1) may be totaled and disclosed as an aggregate sum, or they may be itemized by the specific fees and taxes imposed. If an aggregate sum is disclosed, a general term such as security interest fees or "filing fees" may be used.

The Commentary also further explained 12 C.F.R. § 226.4(b)(6), at ¶ 226.4(b)2, as follows:

> 2. Costs of doing business. Charges absorbed by the creditor as a cost of doing business are not finance charges, even though the creditor may take such costs into consideration in determining the interest rate to be charged or the cash price of the property or service sold. However, if the creditor separately imposes a charge on the consumer to cover certain costs, the charge is a finance charge if it otherwise meets the definition. For example:
>
>> A discount imposed on a credit obligation when it is assigned by a seller-creditor to another party is not a finance charge as long as the discount is not separately imposed on the consumer. (See section 226.4(b)(6).)

█ The effect of the Commentary to § 226.4(e) was clear. It overruled the first line of cases cited at page 856 *supra*. As long as the entire sum of the fees charged was set forth, the disclosure of the fees was now said to be sufficiently itemized.

█ The effect of the amendments to Reg. Z, § 226.4(b) were somewhat less obvious. However, by adding the requirement that "the customer is required to pay the charges in cash" which were imposed in the case of an assignment in order that such charges be included in the finance charge, the regulation was aimed at overruling the second line of cases noted at page 856 *supra*. This effect was carried through in the Commentary, which emphasized that the original creditor's absorption of charges such as discounts given to finance institutions were "a cost of doing business," not "finance charges," as long as the consumer was not obliged to ultimately shoulder these charges. However, the customer was not generally required to pay the "deep discounts" at which the lending institutions purchased the paper of the sellers, typically health spas, in cash. Therefore, such discounts could no longer be designated as "hidden finance charges." *See April v. Union Mortgage Co.*, 709 F.Supp. 809, 812–14 (N.D.Ill.1989); and NATIONAL CONSUMER LAW CENTER, TRUTH IN LENDING 40, 44 (1986).

However, it is important to note, for purposes of our application of "new" 12 C.F.R. §§ 226.4(b)(6) and (e)(1) to the instant fact situation, what the amendments to Reg. Z and the addition of the Commentary did *not* do. While easing the burden of creditors as to the sufficiency of disclosures of official fees to have such charges excluded from the finance charges, these amendments and additions did not, and indeed could not, change the principle that, if a creditor failed to meet the lower disclosure threshold which they established, in even a technical sense, liability for violation of the TILA necessarily followed.

F.  BY FAILING TO INCLUDE A CHARGE WHICH *IS* IMPOSED ON THE DEBTOR AS A CHARGE FOR AN ASSIGNMENT IN THE FINANCE CHARGE, CREDITHRIFT HAS VIOLATED 12 C.F.R. § 226.4(b)(6).

█ The touchstone of the new 12 C.F.R. § 226.4(b)(6) is the dichotomy between charges imposed upon the original creditor for accepting an assignment of a consumer's obligation for which the consumer *is* required to pay as opposed to those for which he is *not* required to pay. As the Commentary clearly states: "if a creditor separately imposes a charge on the customer to cover certain costs," like the cost of making an assignment, "the charge *is* a finance charge. . . ." (emphasis added).

¶ 226.4(e)2. Thus, assignment charges imposed solely upon the original creditor may be excluded from the finance charge if adequately disclosed. However, charges imposed upon the consumer to cover the creditor's costs of making a subsequent assignment may not be excluded from the finance charge even if disclosed. In the instant factual matrix, the charge for recording the assignment of the mortgage in issue is an *extra* $25 charged to the Debtor on account of Builders' assignment of the contract to Credithrift. Hence, this charge may *not* be excluded from the finance charge. As a result, by failing to include this charge in the finance charge here, Credithrift has underdisclosed the finance charge in this transaction.

Credithrift attempts to extricate itself from the inexorable logic of this reasoning, not by reference to 12 C.F.R. § 226.4(b)(6), but by reference to 12 C.F.R. § 226.4(e)(1). It claims that the $25 fee for recording the mortgage is among the "fees prescribed by law ... that ... are or will be paid to [a] public official for ... perfecting ... a security interest," which, having been adequately itemized and disclosed, may be excluded from the finance charge. Credithrift claims that the charge is imposed "for filing or recording" the assignment of the mortgage, a document which it contends is certainly "similar" to a "mortgage" itself. However, we believe that the exclusion of assignments or references in either Reg. Z or the Commentary to "like" charges for "purchasing or accepting" a consumer's obligation is intentional and extremely significant. All of the charges enumerated as excludable from the finance charge when properly itemized and disclosed in § 226.4(e)(1) relate to charges for the recording of security documents taken by the original creditor. None relate to charges for assignments or recording of documents by parties than these to the original transaction. Only § 226.4(b)(6) addresses the topic of when *such* charges may be excluded from the finance charge, *i.e.*, only when they are not passed on to the consumer as an extra charge.

In the Agreement, $60.00 was allotted to the "TO PUBLIC OFFICIALS" category.

Of this amount, $20.00 was utilized to record the mortgage on the Debtor's principal residence and $15.00 is being held to satisfy the mortgage at a future date. Both of these charges clearly fall within the language of § 226.4(e)(1).

However, the $25.00 fee for recording the mortgage assignment does not fall under the provisions of 12 C.F.R. § 226.4(e)(1). The Debtor was not a party to the assignment of the mortgage from Builders to Credithrift; this was an aspect of a transaction which involved solely the business relationship between Builders, the Debtor's initial lender, and a third party, Credithrift.

We therefore conclude that, while 12 C.F.R. § 226.4(e)(1) allows a creditor to the original transaction to exclude charges relating to the perfection of that creditor's security interest in the consumer's property from the finance charge as long as it discloses these charges within a general category of excludable charges, it does not authorize a creditor to expand the general category of excludable charges. Thus, in *Cenance v. Bohn Ford, Inc.*, 621 F.2d 130, 134 (5th Cir.1980), *rev'd in part on other grounds sub nom. Ford Motor Credit v. Cenance*, 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744 (1982), *on remand*, 666 F.2d 97 (11th Cir.1982), a violation of TILA was found where a $1.00 charge for lien or mortgage recordation was disclosed under the designation "license, title and registration fees." The issue, the court stated, was not "one of improper itemization but rather misnomer." *Id.* at 134–35. *Accord, Zamarippa v. Cy's Car Sales, Inc.*, 674 F.2d 877, 878–79 (11th Cir.1982) (disclosure of a "used car order" as part of the "cash price" constitutes a TILA violation). In both of those cases, moreover, the issue was closer than that here, because the miscategorized charges would have been excludable if they had been placed in the proper category. We believe that requiring the consumer to pay the $25 mortgage assignment cost here constitutes an attempt to exclude a sum from the finance charge which can never be properly excluded therefrom, and an attempt to do this by

the totally impermissible means of combining the disclosure of this fee with excludable charges. *Cf. Campbell v. General Finance Corp.*, 523 F.Supp. 989 (W.D.Va. 1981) (a debt previously discharged in bankruptcy which is charged to a consumer in making a post-bankruptcy loan must be disclosed as a finance charge).

In support of its position, Credithrift places considerable emphasis on *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371 (11th Cir.1984), the only prior case which appears to have ruled on the issue of whether a fee for recording the assignment of a mortgage from the lender to its assignee was properly excluded from the finance charge in a TILA disclosure statement. *Shroder* involved an appeal from a district court judgment denying class certification and entering summary judgment in favor of the creditor on each of three distinct substantive claims: (1) The creditor had failed to disclose the annual percentage rate more conspicuously than the other necessary disclosures; (2) The creditor had failed to include a fee for recording the assignment of its mortgage in the finance charge; and (3) The "net proceeds" of the loan were inaccurately disclosed. The court exhaustively discussed the class issue, on which it affirmed the district court, 729 F.2d at 1374–79, and the first substantive issue, on which it reversed the district court and found liability. *Id.* at 1379–82. It devotes but a single paragraph each to its disposition of the plaintiffs' second and third claims, which were dictum in light of its previous holdings rendering the presence of violations additional to the first asserted violation immaterial. *See* 15 U.S.C. § 1640(g).

In the paragraph discussing the exclusion of fees for recording the assignment of the plaintiffs' mortgages from the finance charge, the court states, *id.* at 1382:

The courts have stated that such recording fees are properly excludable. Title 15 U.S.C.A. § 1605 specifically states that fees or premiums for title examination, title insurance, or similar purposes may be excluded from the finance charge. Under this provision, the fee for recording the assignment of the mortgage was properly excluded from the finance charge on the Truth–in–Lending disclosure statement. *George v. General Finance Corp. of Louisiana*, 414 F.Supp. 33 (E.D.La.1976).

A careful review of *George, supra,* the only holding of the "courts" cited in *Shroder,* indicates that it does not stand for the proposition ascribed to it by the *Shroder* court. In *George,* 414 F.Supp. at 34, the issue raised by the plaintiff was whether a $2.00 charge for "official fees" and a $.75 charge for "notary fees," both disclosed to the borrower and actually paid for these purposes, were properly excluded from the disclosure of the finance charge.

The *George* plaintiff maintained that the notary fee was not a "charge prescribed by law" within the scope of 12 C.F.R. at § 226.4(e)(1) because "'there is no law in Louisiana that prescribes a $.75 notary fee for notarizing a chattel mortgage.'" *Id.* at 35. Louisiana did, however, have a law requiring mortgages to be notarized before the security interest created therein could be perfected. *Id.* The court therefore concluded that the charge was "prescribed by law" and that it was immaterial that the law did not set forth the exact amount of the fee to be paid. *Id.*

*George* clearly addresses the issue of fees charged to the customer by the original creditor. It does not address any fees chargeable for assignment of mortgages and, therefore, that case does not stand for the proposition for which it is cited by the *Shroder* court. Since *George* is *Shroder*'s only supporting authority, we must conclude that the conclusions of the court in *Shroder* are in fact unsupported by precedent. If anything, the citation to *George* reveals that the *Shroder* court has overlooked the significance of 12 C.F.R. § 226.4(b)(6), which it does not cite, as the court failed completely to appreciate the distinction between official fees paid by the original creditor which were at issue in

*George* and official fees paid in furtherance of a subsequent assignment of the mortgage, as were at issue in *Shroder* and in this proceeding but not in *George.*

We also note that the *Shroder* court, in a passage immediately subsequent to that quoted at page 860 *supra* and which Credithrift omits from its own quotations from that case, states as follows, 729 F.2d at 1382:

> *The fee for recording assignment of the mortgage was sufficiently itemized on the Truth–in–Lending disclosure statement. There was no lumping together of various fees under the heading "official fees." The item "recording fees" was broken down into deed, mortgage and other.* The fee for recording assignment of the mortgage was entered under the term "other." The Truth–in–Lending disclosure statement itemizes and discloses the fee for recording the assignments under 15 U.S.C.A. § 1605(d) and Regulation Z, 12 C.F.R. § 226.4(b) (emphasis added).

It is clear why Credithrift chose not to include the language emphasized above. As opposed to the lender in *Shroder*, Credithrift "lumped" together the various fees under the heading of fees paid to "public officials" in the Agreement. The *Shroder* court thus hints that it may have reached a different result had "lumping" such as exists here been found in that case.

In any event, we decline to adhere to the result reached by the *Shroder* court in its brief dictum. Although we believe that Credithrift's failure to disclose the $25 assignment recording fee was a relatively technical violation, it nevertheless constituted a clear violation of new Reg. Z, § 226.4(b)(6). Like any technical but clear violation of TILA, this violation triggers the full panoply of remedies available to a consumer under the TILA when a creditor understates the finance charge. These remedies are further expanded when the creditor fails to acknowledge a valid rescission of the credit agreement based upon such a TILA violation.

G. CREDITHRIFT'S FAILURE TO INCLUDE THE ASSIGNMENT RECORDING FEE IN THE FINANCE CHARGE IN THE AGREEMENT SETS OFF A SERIES OF "MATERIAL VIOLATIONS" OF THE TILA, JUSTIFYING THE DEBTOR'S RESCISSION OF THE AGREEMENT AND TRIGGERING ELIMINATION OF CREDITHRIFT'S SECURED CLAIM AND RIGHT TO ITS COLLECTION OF ANY FINANCE CHARGES; AND RENDERING IT LIABLE FOR A STATUTORY PENALTY FOR REFUSING TO HONOR THE DEBTOR'S VALID RESCISSION THEREOF AND FOR THE DEBTOR'S ATTORNEYS' FEES IN PROSECUTING THIS MATTER.

Credithrift's failure to include the assignment recording fee in the finance charge in the Agreement puts into motion consequences which can only be described as disastrous to it. As a direct result, the disclosure of the finance charge itself is $25 too low, a violation of 15 U.S.C. § 1638(a)(3) and 12 C.F.R. § 226.18(d). Since the finance charge on which it is calculated is understated, the annual percentage rate of the finance charge is also understated, in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18(e).

Less obvious is the fact that the "amount financed" is also incorrect, since it includes the $25 charge which should be part of the finance charge. This figure should actually be $3,330, not $3,355. The failure to accurately disclose this figure is violative of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. § 226.18(b).

Pursuant to 15 U.S.C. §§ 1635(a), (f), and 12 C.F.R. § 226.23(a)(3), the failure of a creditor to accurately provide "material disclosures" required by the TILA authorizes the consumer to rescind the transaction at any time within three years from its consummation. *See, e.g., In re Tucker,* 74 B.R. 923, 929–30 (Bankr.E.D.Pa.1987). The term "material disclosures" includes disclosure of the annual percentage rate, the amount of the finance charge, the amount to be financed, and the balance upon which

a finance charge will be imposed. 15 U.S.C. § 1602(u). The disclosure of all of these terms is erroneous here due to the misplacement of the $25 assignment recording fee. Since multiple "material disclosure" violations occurred in the preparation of the Agreement, the Debtor's dispatch of the rescission letter within three years from the execution of same was effective to timely rescind the Agreement.

█ The consequences of an effective rescission, which the creditor refuses to acknowledge or properly act upon within the requisite 20–day period allotted for doing so, 15 U.S.C. § 1635(b), 12 C.F.R. § 226.23(d)(2), are multi-faceted. Firstly, the security interest taken by the creditor must be terminated. 15 U.S.C. § 1635(b), 12 C.F.R. § 226.23(d)(1). See In re Celona, 90 B.R. 104, 115 (Bankr.E.D.Pa.1988), aff'd sub nom. Celona v. Equitable National Bank, 98 B.R. 705 (E.D.Pa.1989); In re Gurst, 79 B.R. 969, 978 (Bankr.E.D.Pa. 1987), appeals dismissed, C.A. No. 88–2092 (E.D.Pa. August 9, 1988), aff'd, 866 F.2d 1410 (3d Cir.1988); and 88 B.R. 57 (E.D.Pa. 1988); In re Melvin, 75 B.R. 952, 958 (Bankr.E.D.Pa.1987); and Tucker, supra, 74 B.R. at 932. In the context of a Chapter 13 bankruptcy case, the ramifications of this consequence are in themselves very substantial. Whatever secured claim the creditor had is eliminated, and it is reduced to the status of an unsecured creditor whose payment is likely to be diminished further in distribution. In light of this result, the Debtor has no cause to press her § 506 claims and same are dismissed as moot.

Secondly, the consumer is relieved of any liability to pay any finance charges. See Celona, supra, 90 B.R. at 115, Melvin, supra, 75 B.R. at 958; and Tucker, supra, 74 B.R. at 932. Thus, all of the Debtor's payments, totalling $1,773.85, may be deducted from the "real" amount financed, $3,330.00, which results, as the Debtor suggests, in a net unsecured claim of $1,566.15.

The only other remedy requested by the Debtor here was a statutory penalty of $1,000 arising from Credithrift's violation of the TILA in failing to respond to her valid rescission of the loan transaction in appropriate fashion and reasonable attorneys' fees and costs for her counsel. Clearly, these elements of damages are allowable. See Celona, supra, 90 B.R. at 115–16; Gurst, supra, 79 B.R. at 979, 980; Melvin, supra, 75 B.R. at 958, 960; and Tucker, supra, 74 B.R. at 932–33.

Other remedies potentially recoverable by the Debtor were not requested and therefore must be deemed waived. See Celona, supra, 90 B.R. at 115; and Tucker, supra, 74 B.R. at 933. The most apparent of these would have been a claim of recoupment of $1,000 against Credithrift remaining unsecured claim in light of the multiple TILA disclosure violations in the Agreement. See Celona, supra, 90 B.R. at 115; Melvin, supra, 75 B.R. at 959; and Tucker, supra, 74 B.R. at 932. Less obvious, but probably equally viable, would have been a claim that the entire loan balance be stricken. See Gill v. Mid–Penn Consumer Discount Co., 671 F.Supp. 1021, 1026 (E.D.Pa.1987), aff'd, 853 F.2d 917 (3d Cir.1988); Gurst, supra, 79 B.R. at 979; and Tucker, supra, 74 B.R. at 933. An argument could even have been made that the payments remitted to Credithrift by the Debtor should be returned to her. See Gurst, supra, 79 B.R. at 979; and Tucker, supra, 74 B.R. at 933. Again, however, we note that the Debtor must be and should be content with the harvest which she has reaped from the very real but nevertheless scarcely egregious violation of TILA for which Credithrift is herewith held liable.

## H. CONCLUSION

An Order consistent with the conclusions expressed in this Opinion will be entered. As we indicated at page 854 supra, the slow progress of this case prompts us to enter an order directed towards achieving confirmation of the Debtor's plan on December 5, 1989.

## ORDER

AND NOW, this 7th day of November, 1989, upon consideration of the Debtor's Complaint, the Stipulation of Facts and

supplement thereto constituting the record in this proceeding, and the parties' respective Briefs, it is hereby ORDERED AND DECREED that:

1. Judgment is entered in favor of the Plaintiff–Debtor, ELIZABETH MARIE BROWN, and against the Defendant, CREDITHRIFT OF AMERICA CONSUMER DISCOUNT CO. (hereinafter referred to as "Credithrift") on all of the claims set forth in Count I of her Complaint.

2. It is DECLARED that the Debtor properly exercised her right to rescind the contract of August 24, 1985, in issue and that therefore this contract is deemed RESCINDED.

3. The Claim of Credithrift against the Debtor is reduced to an unsecured claim in the amount of $1,566.15.

4. Credithrift is directed to satisfy the mortgage which it has taken against the Debtor's residential real estate at 5614 Pemberton Street, Philadelphia, Pennsylvania 19142, within fifteen (15) days from the date of this Order.

5. Credithrift shall pay the sum of $1,000.00 to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The said Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

6. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel, per 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtor's counsel may, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987). However, if the Debtor's counsel has made a reasonable request for such fees which is refused, the said counsel may recover compensation for time spent on the fee application as well.

7. In light of this disposition, Count II of the Complaint is DISMISSED as moot, and the file in this proceeding shall be closed when it becomes a final unappealable order.

8. The hearing on Confirmation in the Debtor's main bankruptcy case and the trials of Adversary Nos. 89–0953S and 89–0960S shall be held on

TUESDAY, DECEMBER 5, 1989, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

9. No further continuances of this hearing and these trials will be favored because of the delays that same will cause to confirmation of the Plan in this case.