**In re Ruby GRIGSBY, Debtor.**

**Ruby GRIGSBY and Edward Sparkman, Esquire, Plaintiffs,**

v.

**THORP CONSUMER DISCOUNT CO. d/b/a ITT Financial Services, Defendant.**

**Bankruptcy No. 90–10990S. Adv. No. 90–0415S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 3, 1990.

Order filed Nov. 9, 1990.

Gary E. Klein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff-debtor.

Edward Sparkman, Philadelphia, Pa., plaintiff-trustee.

Andrew Markowitz, Lahaska, Pa., for defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding has been instituted by RUBY GRIGSBY, the Debtor ("the Debtor"), on behalf of herself and EDWARD SPARKMAN, ESQUIRE, the Standing Chapter 13 Trustee ("the Trustee"), against THORP CONSUMER DISCOUNT CO. d/b/a ITT FINANCIAL SERVICES ("ITT"), an obligee on a mortgage loan contract with the Debtor which the Debtor apparently believes may file a proof of claim against her in her individual Chapter 13 bankruptcy case. The Debtor seeks a determination that she has a right to rescind the loan contract as a result of two discrete, allegedly material violations of the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("the TILA"), in the writing of her loan contract; and that she is entitled to certain treble damages against ITT under Act 6 of 1974, 41 P.S. § 101, *et seq.* ("Act 6"), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (referred to hereinafter by its generic identity as a statute regulating unfair and deceptive acts or practices, or "UDAP"), on account of ITT's allegedly usurious imposition of finance charges.

We conclude that the alleged violations of the TILA—that ITT improperly excluded from disclosure as part of the finance charge in the transaction (1) a fee paid to a loan broker which the Debtor failed to establish that ITT required, or even procured, his inclusion in the transaction; and (2) a charge for title insurance which appears "bona fide and reasonable" even though the policy was not issued until just after the loan was completed—both lack merit. We do, however, find that the presence of a remaining balance on a first mortgage ahead of ITT's own mortgage precludes ITT from justifying interest charges in excess of those permitted by Act 6 on the ground that the state maximum interest limit was pre-empted by the federal Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1735f–7a(a)(1) ("the DIDMCA"). However, although we conclude that the terms of the loan contract must be modified to comply with Act 6's interest limitations, we decline to award treble damages demanded by the Debtor to her under Act 6 or UDAP.

### B. PROCEDURAL HISTORY

The underlying Chapter 13 bankruptcy case was filed on March 5, 1990. A confirmation hearing on the Debtor's Plan of Reorganization is scheduled on October 11, 1990.

The Debtor commenced a separate adversary proceeding against Town Finance Corp. ("Town"), at Adv. No. 90–0438S on June 1, 1990, also based upon a right to rescind that loan under the TILA and claims under Act 6 and UDAP. On August 1, 1990, we approved a settlement in that proceeding in which Town agreed to satisfy all mortgages which it had against the Debtor's realty and pay her $10,000.

The Debtor's current Plan of Reorganization contemplates the sale of a residential property next door to her home and funding all secured claims against her with the proceeds. No motion seeking permission to approve any sale of the non-residential property has as yet been filed by the Debtor. However, the proceeds of the Town settlement are apparently intended to be used in the Debtor's fulfillment of her planned goal of liquidating all secured claims, including that of ITT, from assets of the estate.

The first pleading filed in this court involving the instant parties was a motion of ITT seeking relief from the automatic stay to proceed to enforce its rights under the parties' loan contract on April 19, 1990. However, this motion was withdrawn by ITT on July 3, 1990.

Perhaps ITT's action was prompted by the recognition that its rights could not be ascertained until resolution of the instant adversary proceeding, which was filed on May 18, 1990. It was tried on August 14, 1990. In addition to a stipulation of facts dictated orally into the record, the Debtor, who is herself a seriously-disabled stroke victim, called as witnesses her daughter, Dolores Grigsby ("Dolores"); Garrett Daniels ("Daniels"), the former manager of ITT's branch office in Warminster, PA, where the loan was written; and (3) Minnie Robinson ("Robinson"), a clerical employee in the Warminster office. Post-trial submissions of Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs were directed to be filed by August 31, 1990 (the Debtor), and September 17, 1990 (ITT).

Just before ITT's submissions were due, the parties were directed to attend a settlement conference conducted by the Honorable Judith H. Wizmur of the District of New Jersey on September 13, 1990. During these negotiations, which ultimately proved unsuccessful, ITT obtained, by agreement of the parties, an extension until September 20, 1990, to submit its Brief. With ITT's permission, the Debtor filed a Supplemental Memorandum attacking the result pertinent to the usury issue reached by us in *In re Kenderdine, Kenderdine v. Polonia Federal Savings & Loan Ass'n*, 118 B.R. 258 (Bankr.E.D.Pa.1990).

Since this is an adversary proceeding, *see* Bankruptcy Rule ("B.Rule") 7052 and Federal Rule of Civil Procedure 52(a), and certain factual findings are relevant to the outcome, we are submitting this Opinion in the classic format of Findings of Fact followed by Conclusions of Law recited as headnotes to discussions which follow.

## C. FINDINGS OF FACT

1. On September 18, 1987, the Debtor, then 70 years old and the owner of two adjacent homes, one of which was her residence and the other of which was used as an income-producing boarding home, entered into a loan transaction with ITT, at which time the Debtor executed a Note and a Mortgage on her residential realty, and received a Federal Disclosure Statement ("D/S") and Notice of Right to Cancel.

2. The Note, consistent with the other loan documents, recited that the Debtor was obligated to pay to ITT the principal sum of $43,638.54, plus interest at the rate of 16.00 percent per annum, to be remitted in 120 monthly installments of $731.00 each, which represents a total payoff of $87,720.

3. Included in the principal amount of the loan was a pre-paid finance charge to ITT for "points" of $3,054.73, which, as recited on the D/S, brought the Annual Percentage Rate ("APR") of the loan to 17.99 percent per annum. The actual principal borrowed in the loan was therefore $43,638.54 less $3,054.73, or $40,583.81.

4. Included in the itemization of the proceeds distributed to the Debtor in the transaction was the sum of $23,291.93 which was intended by the parties to be paid to Town in full satisfaction of Town's existing first mortgage on the property.

5. As a result of an error by ITT, the amount itemized to be paid to Town was incorrectly understated as about $500.00 less than the amount actually required to be paid to Town to fully satisfy its mortgage. As a result, Town retained a small mortgage senior to ITT after the loan transaction, and ITT obtained a second, not a first, mortgage on the Debtor's property.

6. The itemization of the distribution of the loan proceeds in the D/S stated that the sum of $4,252.43 would be disbursed directly to the Debtor. However, ITT drew two separate checks of the proceeds to the Debtor, one in the amount of $1,500.00 and another in the amount of $2,752.43.

7. The check for $1,500.00 bears endorsements of both the Debtor and one Arthur Thomas ("Thomas"). Thomas is a loan broker who was involved in this transaction.

8. Although both Daniels and Robinson recognized Thomas as a loan broker with

whom they had occasional dealings in the past, there is no evidence that ITT initiated, required, or directed the participation of Thomas in this transaction. Dolores, who has a power of attorney for the Debtor at present as a consequence of the Debtor's suffering strokes in January, 1990, and April, 1990, was not involved in the transaction, as her mother apparently had conducted her financial affairs independently prior to her strokes.

9. The itemization of the distribution also recites that a check for $460.25 was forwarded to Ticor Title Insurance Co. ("Ticor") for payment of a title insurance policy. There is no evidence that this charge was not the normal and customary charge of a title company for providing title insurance in the transaction in issue.

10. Daniels testified that, while issuance of such a title insurance policy was a standard requirement on ITT's real-estate loans, Ticor's policy was not issued nor effective until September 21, 1987, three days subsequent to the consummation of the loan. Daniels was therefore forced to concede that the acquisition of title insurance was not a pre-condition for the writing of the loan.

11. The exclusions of the payments of $1,500 to Thomas and $460.25 to Ticor from the Finance Charge, as set forth on the D/S, were the only violations of the TILA identified, argued, or briefed by the Debtor in this transaction.

12. ITT operates at least 20 branch offices within the Commonwealth of Pennsylvania. Daniels estimated that ITT's Warminster office wrote about $500,000 in residentially-secured real estate loans annually. He further testified that, from his knowledge of discussions of the volume of other ITT offices in Pennsylvania in certain meetings, ITT made residentially-secured real estate loans well in excess of $1,000,-000.00 per year. Although Daniels' estimates were obviously not precise, the conclusion that ITT made residentially-secured loans in excess of $1,000,000 annually appears accurate.

13. ITT is licensed by the Commonwealth of Pennsylvania to do business un-der the Pennsylvania Secondary Mortgage Loan Act, 7 P.S. § 6601, *et seq.* ("the SMLA"), and the Pennsylvania Consumer Discount Company Act, 7 P.S. § 6201, *et seq.* ("the CDCA"). However, there is no evidence of any volume of loans that ITT wrote under either of these Acts. There is also no indication that it ever intended to write the instant loan under either of those acts.

14. The Debtor claims to have made payments on the loan through January, 1989, on the sole basis of a recitation in a Notice of Intention to Foreclose letter of April 7, 1989, to her from ITT alleging defaults as of February, 1989. Payments through January, 1989, would constitute 16 payments of $731.00, for a total of $11,-696.00. However, ITT claims that the Debtor paid a total of only $5,207.42 on the loan. The record is insufficient to resolve this controversy.

15. Dolores testified that, at the time that the loan was made, the Debtor received income sufficient to make the payments to ITT by operating a boarding home in her non-residential realty. However, Dolores also observed that the Debtor is no longer operating the adjacent property as a boarding home, and that her only income at present is $387 per month in social security benefits.

16. The loan was purportedly rescinded, pursuant to 15 U.S.C. § 1635 of the TILA, by a letter of the Debtor's counsel to ITT of November 16, 1989. ITT not only has taken no action to effect the rescission but, by a letter of December 28, 1989, of its counsel, expressly denied that the Debtor had a right to rescind the loan.

D. CONCLUSIONS OF LAW/DISCUSSION

1. *This Court has Jurisdiction to both Hear and Determine this matter.*

 Most proceedings instituted in this court in which debtors raise claims under the TILA, Act 6, and/or UDAP against lenders similar to those in issue here are initiated in the form of objections to proofs of claim filed of record by or against the respective debtors, and are therefore clear-

ly core proceedings under 28 U.S.C. § 157(b)(2)(B). *See, e.g., Kenderdine, supra,* at 260; and *In re Russell,* 72 B.R. 855, 857–58 (Bankr.E.D.Pa.1987). However, despite the running of the bar date in this case on October 1, 1990, no proof of claim has been filed on behalf of ITT, either by ITT itself or by the Debtor.[1]

Nevertheless, it seems clear that the instant proceeding, seeking a recovery of funds which could be brought into her estate, is "related to" the Debtor's bankruptcy case. *See, e.g., Crossley v. Lieberman,* 90 B.R. 682, 690–92 (E.D.Pa.1988), *aff'd,* 868 F.2d 566 (3d Cir.1989). In paragraphs 2 and 3 of her complaint, both admitted without qualification by ITT, the Debtor alleges that this proceeding is not only related to the instant bankruptcy case, but is a core proceeding. Conceivably, this proceeding could be classified as core pursuant to 28 U.S.C. §§ 157(b)(2)(K) or (b)(2)(O). In any event, ITT's admission that it is core may be deemed an expression of consent to allowing this court to determine the matter, even if it is non-core. *See* 28 U.S.C. § 157(c)(2); B.Rule 7012(b); *In re St. Mary Hospital, Hiser v. Neumann Medical Center, Inc.,* 117 B.R. 125, 131 (Bankr.E.D.Pa. 1990); and *In re St. Mary Hospital,* 101 B.R. 451, 458 (Bankr.E.D.Pa.1989).

We are therefore empowered to both hear and determine this proceeding.

2. *The Debtor is not Permitted to rescind the instant loan transaction on either of the two grounds Articulated in her complaint.*

a. SINCE THERE IS NO EVIDENCE THAT ITT REQUIRED THE DEBTOR TO USE A LOAN BROKER IN THIS TRANSACTION, THE $1,500 FEE PAID TO THOMAS FROM THE LOAN PROCEEDS WAS NOT REQUIRED TO BE DISCLOSED AS PART OF THE FINANCE CHARGE IN THE TRANSACTION.

■ The Debtor's initial claim of a violation of the TILA on the part of ITT which was sufficiently material to merit rescission of the transaction under 15 U.S.C. § 1635 is her contention that the $1,500 broker's fee paid to Thomas should have been included in the finance charge in the transaction. There is little question that, if the broker's fee indeed was required to have been disclosed as an element of the finance charge in the transaction, ITT failed to do so, and this factor would trigger a series of "material violations" of the TILA, justifying the Debtor's rescission of the loan transaction and the serious consequences which follow when a lender fails to properly act upon a valid rescission. *See, e.g., In re Brown,* 106 B.R. 852, 861–62 (Bankr.E.D.Pa.1989).

However, the Debtor is forced to confront the following passage of the Official Staff Commentary on Regulation Z Truth in Lending ("the Commentary"), ¶ 226.4(a)3, promulgated in 1984 relevant to the necessity of including a loan broker's fee in the finance charge disclosed in a consumer-credit transaction pursuant to the TILA:

3. *Charges by third parties. Charges imposed* on the consumer by someone other than the creditor for services not required by the creditor are not finance charges as long as the creditor does not retain the charges. For example:

A fee charged by a loan broker to a consumer, provided the creditor does not require the use of a broker (even if the creditor knows of the loan broker's involvement or compensates the loan broker). . . .

It is clear to us that the Debtor has not proven that ITT required the use of a loan broker in this transaction, particularly in light of the complete absence of evidence of the relationship between the Debtor and Thomas. *Compare Russell, supra,* 72 B.R. at 858–60, 864, 870–72 (broker's commission paid to party with whom the debtor

---

1. The time in which the Debtor may file a proof of claim on behalf of ITT has not expired. *See* B.Rule 3004. If the Debtor does file a proof of claim under B.Rule 3004, this may reopen a period for ITT to file its own, superseding claim. *See In re Draper, Draper v. Federal Nat'l Mortgage Ass'n,* Bankr. No. 90–10369S, Adv. No. 90–0642S, slip op. at 9–10, 1990 WL 142475 (Bankr.E.D.Pa. Sept. 28, 1990); and *In re Frascatore,* 98 B.R. 710, 722–23 & n. 11 (Bankr.E.D. Pa.1989).

had never contracted and which was concealed in the loan papers was found to be a finance charge which gave rise to actual damages under TILA and UDAP).

The Debtor makes several unconvincing efforts to circumvent the impact of the quoted passage from the Commentary.[2] First, she argues that the TILA and its interpretive Regulations itself do not justify the Commentary's conclusory statement regarding the lack of need to include a broker's fee in the finance charge. For example, the TILA, 15 U.S.C. § 1605(a)(3), provides as follows:

(a) Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of *all charges, payable directly or indirectly by the person to whom the credit is extended,* and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. Examples of charges which are included in the finance charge include any of the following types of charges which are applicable.

. . . . .

(3) *Loan fee, finder's fee, or similar charge* (emphasis added)....

The pertinent Regulations, 12 C.F.R., §§ 226.4(b)(3), (b)(6), provide as follows:

(b) *Examples of finance charges.* The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

. . . . .

(3) Points, loan fees, assumption fees, finder's fees, and similar charges.

. . . . .

(6) Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the

obligation, or as a deduction from the proceeds of the obligation....

She then quotes, in support of her position, a snippet from R. ROHNER, THE LAW OF TRUTH IN LENDING, ¶ 3.02[1][c], at 3–12 (1984) ("Rohner"), in which it is stated that

a finder's fee or broker's fee paid to a third party for arranging the credit between the consumer and the lender is a TILA finance charge (emphasis added)....

Therefore, the Debtor argues, Thomas's broker's fee is a charge "similar" to a finder's fee and must be included in the finance charge.

This argument is juxtaposed with the Debtor's invocation of a 1977 interpretation of the Federal Reserve Board ("the FRB"), which publishes the Commentary, stating that

Where a loan broker contacts a lender on behalf of a borrower and receives a fee from the borrower, the loan broker is an arranger and a creditor; the broker fee is a prepaid finance charge and should be disclosed by the broker and/or lender in accordance with § 226.6(d)....

... [even though] the creditor-lender receives none of the loan fee and neither pays nor agrees to pay a brokerage fee to the loan broker for or on behalf of the borrower or otherwise performs any act to effect or insure payment of the fee by the borrower to the loan broker.

42 FED.REG. 14859 (March 16, 1977). *Accord, In re Security Industrial Loan Ass'n,* CCH CONSUMER CREDIT GUIDE, ¶ 98,103, at 87,549 (Federal Trade Comm'n, Final Order, Sept. 21, 1977).

It is true that a broker's fee does qualify, under 12 C.F.R. § 226.4(b)(6), as a charge which the Debtor was required to pay to Thomas in addition to the loan obligation. *Compare Brown, supra,* 106 B.R. at 856–61. However, as Rohner explains elsewhere in his treatise, the difference in approaches by the FRB in its 1977 interpretation and decision in *Security Industrial*

---

2. Obviously, this court was unaware of the presence of this Commentary passage when it opined, at the close of the trial, that Thomas's

fee would most probably have had to have been disclosed as part of the finance charge in the transaction.

*Loan, supra,* and its Commentary in 1984 is attributable to the fact that

> [t]he TIL Act now completely removes from the definition of "creditor," and thus from TIL coverage, persons who do not extend but merely "arrange" for extensions of credit. The most common examples would be *loan brokers* or real estate agents *who regularly assist* consumer borrowers in obtaining credit from others. Section 702 of the Garn–St Germain Depository Institutions Act of 1982 [87] rewrote the definition of creditor to exclude "arrangers" altogether from the coverage of the Act (emphasis added)....
>
> 87. Pub.L. 97–320, 96 Stat. 1538, *amending* TIL Act § 103(f), 15 USC § 1602(f).

Rohner, *supra,* ¶ 2.02[2], at 2–20.

Later, *id.,* at ¶ 3.01[1][a], at 3–5, Rohner states as follows:

> Thus assume a loan where the borrower is charged the cost of having the lender's agent inspect the property offered as security. Except in mortgage transactions, this charge is clearly a finance charge for TIL purposes, whatever its characterization under state law. By contrast, *take a transaction in which a loan broker has brought a borrower and a lender together. The broker charges a fee for this service to the borrower.* The fee certainly is a cost of credit to the borrower, thus it should be disclosed as a finance charge. But, *if there is no fee-splitting or similar arrangement between the lender and the loan broker, there is little reason to include the fee as part of the finance charge, or interest, in measuring whether the loan is usurious* (footnotes omitted) (emphasis added).

Rather, later, Rohner concludes, in a passage directly following that quoted by the Debtor at page 485 *supra, id.,* ¶ 3.02[1], [c], at 3–12, as follows:

> A fee charged by a loan broker to a consumer will *not* be a finance charge unless the actual creditor *requires* the use of the broker to make the loan; it is not enough that the lender merely knows

of the loan broker's involvement or compensates the loan broker in some way. This qualification flows from the requirement that the finance charge must be "imposed directly or indirectly by the creditor." Under the TIL Act prior to simplification, it was likely that the finder or broker would qualify as an "arranger" of credit. As a result, the fee would be imposed directly by a "creditor," even though not by the actual lender.[55] The current law no longer includes the finder or broker as a creditor.[56] Thus the third-party broker's fee is a finance charge only when the creditor in the transaction (i.e., the lender) actually imposes and collects the broker's fee, or requires that the broker's services be utilized.[57]

[55] See Security Indus. Loan Ass'n, [1974–1980 Transfer Binder—Decisions] CCH–CCG 98.445 (FTC Admin.Law J.1976), aff'd, 90 FTC 186 (1977); *In re Dukes,* 24 Bankr. 404 (Bankr.E.D. Mich.1982).

[56] Section 226.2(a)(17)(i) of Regulation Z in pertinent part defines the "creditor" as a person who regularly extends consumer credit and to whom the obligation is initially payable. In addition, under Section 702 of Pub.L. 97–3210, 96 Stat. 1538 (1982), "arrangers" are no longer covered by the TIL Act. This is discussed at ¶ 2.02[2][a].

[57] Commentary ¶ 226.4(a)3.

Therefore, as Rohner illustrates, the change in the FRB's position regarding the necessity of a lender to include a broker's fee in the finance charge in a loan transaction is, at bottom, attributable to a Congressional intention, in post–1977 amendment to "simplify" the TILA, *see Brown, supra,* 106 B.R. at 856–58, to limit the scope of "creditors" to exclude "arrangers" of credit in 15 U.S.C. § 1602(f), not a mere administrative whim. When this is realized, the Debtor's further argument that the Commentary is "irrational" and therefore should not be followed, within the guidelines for broad deference to FRB interpretations of the TILA articulated in *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980), must be rejected. The new interpretation of the creditor's need to disclose a broker's fee or commission as part of the finance charge included in the Commentary

is, in fact, a perfectly rational response of the FRB to an intervening Congressional change to the TILA.[3]

Finally, the Debtor, citing *Russell, supra,* and *Dukes, supra,* argues that, even under the terms of the Commentary,

> there is ample evidence to conclude that the broker's charge was imposed by the defendant. First, the defendant regularly solicits business from loan brokers and offers them commissions. Second, the defendant regularly does business with the loan broker employed here, both before and after the transaction involving plaintiff. Third, the broker called in the loan and provided information, including a credit check which the defendant relied on, presumably because of its prior dealings with the broker.[11] Fourth, the defendant recorded the amount of the broker's commission in advance of consummation of the transaction on its loan approval form. Fifth, the defendant cut a separate check payable to the plaintiff which they directed was to be endorsed and was ultimately paid to the loan broker.
>
> 11. If the broker had been working for the plaintiff, defendant certainly would not have relied on his credit check. No responsible lender would simply rely on its customer's own credit report.

Plaintiff's Memorandum of Law, at 26–27.

We do not agree with the Debtor's suggestion that the record supports the conclusion that ITT aggressively "offers ... commissions" to brokers, nor the suggestion that the record establishes that Thomas has a symbiotic relationship with ITT. Rather, Daniels and Robinson stated that they knew Thomas from but a few other dealings. There is no evidence to rebut this testimony, nor is there evidence that they encouraged his activities, nor that Thomas in any way imposed himself upon the Debtor. Shorn of these embellishments of the facts of record, it is clear that there is no evidence that ITT required the use of Thomas or a broker in general in this transaction.

In *Dukes,* a decision which preceded the publication of the pertinent 1984 Commentary, *see* page 486 *supra,* the court found that, where an alleged broker performed no services for the borrower and had a very large volume of business with the lender, its fees must be included in the finance charge in that transaction. 24 B.R. at 407–08, 410–13. No such facts were proven here. In *Russell,* where the presence of the Commentary was never raised as an aspect of the defense, the broker's commission was concealed and his role was unknown to the Debtor and hence almost invisible. 72 B.R. at 858–60, 864, 870–72. Both of these settings permitted the inference that the broker's presence was imposed by and hence effectively required by the lender. Here, by way of contrast, the broker's commission was candidly revealed and there is evidence, *e.g.,* his providing the credit report, that Thomas performed services which a bona fide loan broker would normally be expected to perform.

Therefore, we must reject the Debtor's contention that ITT violated the TILA, either materially or even technically, in failing to include the broker's fee paid by the Debtor to Thomas in the finance charge recited in the D/S.

b. SINCE THE TITLE INSURANCE OBTAINED BY ITT IN CONNECTION WITH THIS TRANSACTION HAS NOT BEEN PROVEN TO HAVE BEEN OTHER THAN "BONA FIDE" OR "REASONABLE" SIMPLY BECAUSE IT WAS NOT ISSUED UNTIL AFTER THE LOAN WAS CONSUMMATED, THIS CHARGE ALSO NEED NOT HAVE BEEN DISCLOSED AS PART OF THE FINANCE CHARGE IN THIS TRANSACTION.

■ The only other TILA violation articulated by the Debtor is a contention that ITT's cost of $460.25 for title insurance on the Debtor's property secured by the loan

---

3. Since the loan in issue post-dated the promulgation of § 226.4(b)3 of the Commentary, there can be no contention that the Commentary is being applied retroactively here. *Compare In re Milbourne,* 108 B.R. 522, 530–31 (Bankr.E.D.Pa. 1989), and cases cited therein.

in issue should also have been included in the finance charge, with consequences similar to those enunciated in connection with ITT's failure to include the broker's fee in its computation of the finance charge. *See Brown, supra,* 106 B.R. at 861–62; and page 484 *supra.* The Debtor's argument on this issue is less elaborate and even more clearly without basis than her contention based on ITT's exclusion of the broker's fee from the finance charge disclosed in the D/S.

We begin with the pertinent regulatory provision, 12 C.F.R. § 226.4(c)(7)(i), which states as follows:

(c) *Charges excluded from the finance charge.* The following charges are not finance charges:

. . . . .

(7) The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes....

There is no more detailed statement on this issue in either the corresponding statutory provision, 15 U.S.C. § 1605(e)(1), or in the pertinent Commentary, ¶ 226.4(c)(7). Therefore, here, we need not quote nor consider these sources.

The sum and substance of the Debtor's argument is that the fees charged were neither "bona fide" nor "reasonable" in light of Daniels' concession that Ticor's policy was not issued until three days after the loan was made and therefore was not a pre-condition of the loan. The Debtor's reasoning does not appear intuitively sound, nor is she able to cite any authority in support of this argument.

The most comprehensive statement of the bounds of the "bona fide and reasonable" requirements as to charges passed through by lenders to borrowers in transactions secured by real estate appear to be articulated by Rohner, *supra,* ¶ 3.03[2][a], at 3–30 to 3–31, in the following passage:

To be excluded from the finance charge, the fees must not only be the right types, but they must also be "bona fide and reasonable in amount." They are bona fide even if the services for which the fees are imposed are performed by employees of the creditor rather than by a third party. However, a charge for required owner's title insurance would not be bona fide where the creditor's requirement that such insurance be purchased constitutes a violation of state law. Charges must be reasonable in amount so as not to allow inflated costs to indirectly augment the creditor's yield. Reasonableness should be determined by comparing the charges imposed by a particular creditor with the prevailing practices of the industry in the locality. Thus, if the creditor picks an "expensive" third party and is receiving a rebate, there is some risk a hidden finance charge may be determined to exist (footnotes omitted).

In line with Rohner's comments is the sole authority [4] cited by the Debtor, *Therrien v. Resource Financial Group, Inc.,* 704 F.Supp. 322, 327 (D.N.H.1989), where the court, not surprisingly, found that a creditor's double charges of title insurance, recording, and discharge fees were "neither bona fide nor reasonable."

Intuitively, we see no reason why a title insurance policy would have to be issued prior to the loan closing to be useful to ITT. The policy was obviously intended to protect ITT if a later cloud upon the Debtor's title emerged which would diminish the value of ITT's mortgage as a security device. It seems logical for ITT to have purchased such insurance in connection with such a large loan to an elderly individual with limited financial means, making the security provided an extremely significant factor to ITT in making the loan. ITT's perhaps ill-advised closing on the loan prior to issuance of the policy (or at all) diminished some of the policy's value to it. However, we cannot say that it rendered the policy useless and superfluous to

---

4. The only other authority which we found relevant was *Postow v. Oriental Building Ass'n,* 390 F.Supp. 1130, 1133–35 (D.D.C.1975), in which it was held that the fact that title insurance bene-fits the lender as opposed to the borrower is not significant in determining whether the charge could be passed on to the borrower.

such a degree that its purchase was not "bona fide and reasonable."

There is no evidence that the purchase of title insurance was in any way illegal, or that the charges imposed by Ticor were excessive, either due to a relationship between that company and ITT, or otherwise. These are the considerations which Rohner deems significant. *See* page 488 *supra.*

It is also instructive to compare ITT's exclusion of Ticor's title insurance charge from the finance charge imposed by ITT in the instant transaction with the facts in two other cases in which we found the imposition of charges upon the respective borrowers without including same in the disclosure of finance charges was impermissible and hence gave rise to valid claims for TILA rescissions. In *In re Celona,* 90 B.R. 104, 111–12 (Bankr.E.D.Pa.1988), *aff'd sub nom. Celona v. Equitable Nat'l Bank,* 98 B.R. 705 (E.D.Pa.1989), we held that a $200 legal fee charged to the borrower to compensate the lender's counsel for scanning the loan papers for TILA violations could not be excluded from the finance charge. However, that result was based upon a passage in the Commentary, ¶ 226.4(c)(7), that attorney's fees were excludable from the finance charge only if they were imposed for services performed which were related to conducting the closing in the transaction, which did not include checking the loan documents for TILA violations. By way of contrast, the title insurance charges in issue are expressly declared excludable under the statute, Regulation, and Commentary and were clearly related to the real estate closing. *Compare also First Arcadia Bank v. Federal Deposit Ins. Corp.,* 833 F.2d 548 (5th Cir. 1987) (attorneys' fee charge which lender could have easily avoided is held not excludable from the finance charge).

In *Brown, supra,* we declared a loan rescindable solely because of a seller's failure to include a $25 fee for recording an assignment of its mortgage to a lender in its calculation of the finance charge. However, this decision was based upon the fact that the charge was not designated as expressly excludable in 15 U.S.C. § 1605(e) or 12 C.F.R. § 226.4(c), and was among the types of charges which were to be included within the scope of finance charges under the Regulations. 12 C.F.R. § 226.4(b)(6). Here, the charge in issue is in fact among those expressly said to be *excludable* from the finance charge imposed in the transaction.

We therefore find that the result that the $460.25 paid to Ticor may be excluded from the finance charges as disclosed by ITT in the instant transaction is compatible with the results in *Celona* and *Brown,* as well as the applicable statutes, Regulations, and Commentary. Therefore, as in the case of ITT's exclusion of the broker's fee from the finance charge disclosed in the transaction, we conclude that no TILA rescission claim arises from ITT's failure to include the cost of Ticor's title insurance in the finance charge.[5]

3. *The Debtor is entitled to a Declaration that ITT has considerably overstated the interest legally chargeable to it in the loan transaction, although she is not entitled to treble damages under Act 6 OR UDAP as a result.*

a. THE PRESENCE OF TOWN'S FIRST MORTGAGE, EVEN IF IN ERROR, PRECLUDES ITT'S RELIANCE ON THE DIDMCA OR ANY LAW OTHER THAN THE STATE LAW LIMITATION ON FIRST MORTGAGES SET FORTH IN ACT 6 AS A BASIS FOR NONCOMPLIANCE WITH ACT 6'S INTEREST–RATE LIMITATIONS, AND RENDERS THE LOAN USURIOUS.

Act 6 is, among other things, Pennsylvania's usury law. It provides that "[e]xcept

---

5. We are compelled to observe that the two TILA violations discussed at pages 484–489 are the only TILA violations alleged by the Debtor. We will not exercise any free-floating warrant to uncover any other TILA violations in the transaction not articulated by the Debtor. *Cf. Robinson v. Central Loan & Finance Corp.,* 609 F.2d 170, 172–74 (5th Cir.1980) (court properly failed to consider addition TILA violations asserted after initial violations were rejected). A potentially-meritorious claim could perhaps have been articulated on the basis of the fact that the finance charge, being usurious, *see* pages 489–91, 493–94 *infra,* is overstated. *Cf. In re Steinbrecher,* 110 B.R. 155, 165 (Bankr. E.D.Pa.1990).

as provided in Article III of this act," the maximum lawful rate of interest chargeable to borrowers is six (6%) percent per annum. 41 P.S. § 201. However, two important exceptions are made to this general interest-rate limitation in Act 6: (1) if the maximum lawful rate is "inconsistent" with another act "permitting or removing" a maximum interest rate. 41 P.S. § 604; and (2) if the transaction involves a "residential mortgage," in which case the maximum interest rate is established by a figure published each month in the Pennsylvania Bulletin by the Secretary of Banking, which figure is to be two and a half (2½%) percent higher than the Monthly Index of Long Term United States Government Bond Yields. 41 P.S. §§ 301(a) to (e).

■ In 1980, the DIDMCA was enacted. It provides that state laws limiting interest rates are pre-empted in the event that a loan is

 (A) secured by a first lien on residential real property, . . .

 (B) made after March 31, 1980; and

 (C) described in section 527(b) of the National Housing Act (12 U.S.C. 1735f–5(b) [section 1735f–5(b)] of this title,. . . .

12 U.S.C. § 1735f–7a(a)(1). Among the provisions of 12 U.S.C. § 1735f–5(b), as referenced therein, is the requirement that a loan

 (D) is made in whole or in part by any "creditor," as defined in section 1602(f) of Title 15, who makes or invests in residential real estate loans aggregating more than $1,000,-000 per year.

*See Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 910–11 (3d Cir.1990); and *Russell, supra*, 72 B.R. 866–67 & n. 2.

As we emphasized in *Russell*, the lender "must meet the burden of establishing that it is within the definitions of" the terms expressed therein in order to invoke the protections of the DIDMCA, particularly since the interest-rate crisis which sparked the enactment of the DIDMCA has abated. *Id.* at 867.

ITT charged the Debtor a "prepaid finance charge" of $3,054.73 in the transaction in issue, and imposed a 16 percent interest rate on the balance, resulting in a disclosed finance charge of $47,136.19, at an APR of 17.99 percent. In September, 1987, the highest permissible charge on a "residential mortgage" obligation under 41 P.S. § 301(c) of Act 6 was 11.25 percent. Moreover, Act 6 expressly prohibits the addition of "discount points," such as made up the "pre-paid finance charge" here, in such a transaction. 41 P.S. § 402. As the principal balance of the Debtor's loan was less than $50,000, it was a "residential mortgage" obligation, within the scope of the interest-rate limitations set forth in 41 P.S. § 301(c).

■ ITT contends, firstly, that the transaction is controlled by the DIDMCA. It attempts to overcome the seemingly insurmountable burden of proving that its loan was secured by a first lien on the Debtor's residence, in light of the admitted presence of Town's small, remaining first mortgage at the time of the transaction, by arguing that the parties intended that its lien be in first position. This argument is unconvincing. Town's first lien *existed* at the time of the instant transaction, irrespective of the intentions of the parties to eliminate it. A contention that the parties could stipulate the existence of the Town mortgage away by their common intentions to the contrary is, in substance, a misplaced argument that a borrower may waive a claim of usury. Such a contention is negated by Act 6 itself, 41 P.S. § 408, and the undisputed principal that a claim of usury cannot be waived. *See, e.g., Kenderdine, supra*, at 264; *Simpson v. Penn Discount Corp.*, 335 Pa. 172, 175–76, 5 A.2d 796, 798 (1939); and *Gilbert v. Otterson*, 379 Pa.Super. 481, 486–87, 550 A.2d 550, 553 (1988).

The three requirements which must be met by a lender in order to invoke the DIDMCA, see pages 489–90 *supra*, are stated in the conjunctive. *See Smith, supra*, 898 F.2d at 910–11. The failure to meet the "first lien requirement" of the DIDMCA is fatal to ITT's defense on this basis. We therefore need not explore whether Daniels' testimony regarding the volume of ITT's business was sufficient to meet the "$1 million volume requirement" of the DIDMCA. *Compare Russell, supra*, 72 B.R. at 860, 868 (court declined to

take "judicial notice" of a non-evidentiary Affidavit of a lender's President, the only evidence submitted to establish the "$1 million volume requirement").

■ ITT's second line of defense on the charge of usury is that, if we find the DIDMCA inapplicable (as we do), we should consider the loan as one written pursuant to the SMLA. ITT contends that, since the SMLA, under which it is licensed to do business, would have permitted it to impose finance charges of over 22 percent, a rate even higher than the interest rate charged to the Debtor by ITT in this transaction, we should conclude that the loan was not usurious. The difficulties with this argument are that (1) as ITT admits, neither of the parties intended to make a loan under the SMLA; and (2) the loan documents and terms in no way resemble those required by the SMLA.

In regard to the second point, a contract must be labelled as a "Secondary Mortgage Loan" to satisfy the SMLA. 7 P.S. § 6613. The instant loan papers are not so labelled. Also, a lender is prohibited, by the SMLA, from making pre-paid finance charges for "points" or the like in excess of 2 percent of the original loan balance. 7 P.S. § 6609(a)(8). The maximum points allowable under the SMLA would therefore be two (2%) percent of the principal balance of $40,583.61, or $811.68, far less than the $3,054.73 for "points" charged here.

The first point is, however, more fundamental. The SMLA presumably allows a lender to impose finance charges in excess of those allowed to a first mortgagee pursuant to Act 6 because the SMLA lender, accepting security which by its very nature is subordinated to a first mortgage, is for that reason entitled to a higher rate of interest in consideration for its making a loan subject to a lesser quality of security. In the instant transaction, ITT intended to enhance its security position and forfeit any right to the higher permissible interest charges of the SMLA by paying off the Debtor's first mortgage to Town. While it failed to completely satisfy Town's mortgage, it did succeed in greatly reducing Town's priority position and thereby enhancing its security position beyond that normally obtained by a SMLA lender.

It is therefore far from clear to us that, had ITT known that a mere $500 mortgage balance remained owing to Town, it would have been compelled to resort to writing this loan under the SMLA due to economic necessity. Furthermore, there is no evidence that the Debtor would have agreed to accept the terms of an SMLA loan from ITT.

In *Russell,* we rejected the debtor's non-frivolous argument that, in the event that a loan is found to be usurious because it is not in compliance with the law under which it was purportedly written, the six (6%) percent rate of 41 P.S. § 201 should be applied. 72 B.R. at 870. Instead, there, we applied the rate of the CDCA, under which we found that both parties would have unhesitatingly proceeded had they foreseen that the transaction was usurious as written. *Id.* Here, we cannot foresee what the Debtor or even ITT would have done if they had known that the loan was usurious. *Id.* As in *Russell,* we are not inclined to measure the properly-applicable rate at six (6%) percent. However, we are also extremely disinclined to allow a insurer to choose its own "punishment." We will, therefore, not measure the appropriate rate chargeable in this transaction by reference to the SMLA, or for that matter, to the CDCA, regarding the use of which by ITT there is no evidence, but rather by the Act 6 maximum limit for "residential mortgage" transactions at the time that this loan was written, *i.e.,* 11.25 percent.

The interest rate of almost 18 percent charged by ITT in this transaction is well in excess of that permitted under Act 6. Therefore, the loan, as written, was usurious. *Compare Kenderdine, supra,* at 263–64.

b. THE DEBTOR IS ENTITLED TO AN ORDER REFORMING THE TRANSACTION TO REFLECT A NON–USURIOUS, 11.25 PERCENT INTEREST RATE, BUT NOT TO TREBLE DAMAGES, AS SHE HAS NOT PROVEN THAT SHE HAS MADE ANY EXCESS INTEREST PAYMENTS OR THAT SHE SUFFERED ANY ACTUAL DAMAGES.

■ In *Kenderdine, supra,* at 264–67, we recently had occasion to address the

issue of the remedies that are appropriate when a court determines that a usurious rate of interest has been imposed in a loan transaction under 41 P.S. §§ 501, 502, 503 of Act 6. The Debtor, having very recently become aware of the *Kenderdine* result, has submitted a Supplemental Memorandum urging us to reconsider that aspect of *Kenderdine* in which we declined to award treble damages to a borrower because the borrower had not yet made payments in excess of the *entire amount* of interest legally payable on the loan. The Debtor argues that, contrary to what we stated in *Kenderdine*, at 265–66, the *Kenderdine* approach was not that utilized by us in *Russell.*

The Debtor is correct in her observation that we did not utilize this approach in *Russell.* We did not compute the excess interest on the entire 60–month period that the loan in issue there was to run, but, rather, computed it as of the 39–month period ending at the time of the borrower's bankruptcy filing. 72 B.R. 860, 861, 869–71.

There are, of course, distinctions between the facts of *Russell* on one hand and *Kenderdine* and this case on the other hand which justifies a different result. First, the difference of the period between the expiration of the loan and the time at which the excess interest was measured was between 60 months and 39 months, much less than the differences of between 13 years and 6½ years (*Kenderdine*) and 10 years and 3 years (here). Therefore, the difference was much less and the distinction of when the finance charges paid and collectible was measured were far less significant in *Russell* than in *Kenderdine* and here. Secondly, our *Russell* decision bristles with outrage at the obvious overreaching played upon the unsophisticated borrower-debtor in that case. 72 B.R. at 859–61, 864, 870. Although the Debtor attempts to articulate the same sort of outrage here, the facts present a borrower of unmeasurable sophistication but who we know owned two pieces of realty, and a lender charging an interest rate about half what the lender charged in *Russell*, which, like the *Kenderdine* lender, basically made a mistake and, while obliged to suffer certain consequences as a result, has not engaged in conduct meriting harsh reprisals. Thirdly, by measuring the "legal" rate of interest chargeable by the *Russell* lender at the CDCA rate, which exceeds that of

even the SMLA, we minimized the *Russell* lender's damages. If we "borrowed" the CDCA rate to measure ITT's "legal" rate here, the transaction would not even be usurious.

Finally, we note that here, unlike in *Russell* or in *Kenderdine*, we are not considering an objection to a proof of claim, which would oblige us to fix the valid amount of the Debtor's claim. We are being asked, in substance, to declare the rights of the parties *inter se.* This causes us to be more reluctant to set a sum in which one party is due to the other than in either of those cases. The positions of the respective parties on the issue of the amount that the Debtor actually paid are so diverse that any determination of the amount of the claim of ITT against the Debtor is impossible to measure at this juncture.

However, the principle distinction is that *Russell* was an early decision, rendered on the basis of sparse briefing and without the benefit of extended reflection on all of the many issues of first impression raised by that proceeding. We reject the Debtor's suggestion that the *Kenderdine* result is contrary to that reached in *Trent Financial Corp. v. Church,* 12 Pa.D. & C.3d 451 (Delaware Co. C.P.1978). It seems clear to us that the *Church* court measured the excess interest by taking the difference between interest paid and the lawful interest chargeable over the entire loan period. *Id.* at 453. There is no doubt that the reasoning in our later decision in *In re Stewart,* 93 B.R. 878, 886–87 (Bankr.E.D. Pa.1988), was directly on target with that in *Kenderdine.*

However, more significant is the weight of authority on the allocation of payments in usurious transactions. The pertinent Pennsylvania law is silent on the issue of how payments made upon a loan which is usurious is to be allocated between principal, legal interest, and excess interest. The Debtor argues, in substance, that we should allocate each payment to portions of all three. However, this is contrary to the general rule adopted in interpretation of the anti-usury provisions of the National Banking Act, 12 U.S.C. § 86 ("the NBA"). The NBA, unlike the Pennsylvania usury law, prohibits collection of any interest when a usurious rate of interest is charged.

From the earliest interpretations of the NBA, the general rule has been that, in the

absence of an agreement between the debtor and the creditor on the application of payments, the payments are to be allocated first to the principal and then to interest. *See, e.g., Young v. First National Bank of Covington,* 22 Ga.App. 58, 95 S.E. 381, 383 (1918); *Moss v. First National Bank of Horse Cave's Receiver,* 251 Ky. 390, 65 S.W.2d 88, 89 (1933); and *Tomblin v. Higgins,* 58 Neb. 336, 78 N.W. 620 (1899). More importantly, the Third Circuit Court of Appeals, in *Danforth v. National State Bank of Elizabeth,* 41 F. 271, 277 (3d Cir. 1891), adopts the principle that, when payments are not specifically allocated to principal and interest in a usurious loan, "[t]he law will appropriate the payment to the principal of the drafts." This is consistent with the general rule that

> when a general payment is made upon a contract tainted with usury, without any direction as to its application, the court will ordinarily apply it upon the principal, and will not apply it upon the unlawful interest reserved....

45 AM.JUR.2d 186 (1969).

There is no evidence that the Debtor's payments, the amount of which is itself greatly in dispute, were allocated towards principal and interest in any specific manner. In applying the general rule to the Pennsylvania usury laws, we therefore would expect that the application of payments would be first to principal, then to legal interest, then to usurious interest. This is the rule of application adopted in *Kenderdine,* at 265–66 & n. 2, and we reiterate it here.

Therefore, we will continue to follow the principles set forth in *Kenderdine* in measuring the consequences of ITT's violation of Act 6 under 41 P.S. §§ 501, 502, 503 in the instant factual setting.

Following *Kenderdine,* the first consequence of ITT's imposition of a usurious rate of interest is a declaration that the loan contract is usurious and that excess interest need not be paid. *See* 41 P.S. § 501; and *Kenderdine, supra,* at 264–65, 267. We note that the difference between the legal rate (11.25 percent) and the rate charged by ITT (almost 18 percent, including the pre-paid finance charges added in the transaction), as well as the principal amount borrowed, is much greater here than in *Kenderdine.* Therefore, the financial consequences are much greater. Our review of APR tables published by the FRB for a loan with an APR of 11.25

percent in which payments are to be made in 120 installments is $67.00 per hundred. Therefore, the maximum permissible finance charge in this transaction was $40,-583.81, the actual principal balance, *see* page 482 *supra,* times .67, or $27,191.15. This is a reduction of $19,945.24 from the total of $47,136.39 of finances charges imposed in the transaction by ITT. This decision, in effect, awards "single damages" to the Debtor for ITT's erroneous imposition of usurious charges of $19,945.24. This remedy, particularly when considered together with the cornucopia realized by the Debtor in her settlement of her adversary against Town, *see* pages 481–82 *supra,* seems a quite sufficient yield by the Debtor from her bankruptcy and attendant litigation.

However, we note that the Debtor has only paid between $5,207.42 (ITT's figure) and $11,696.00 (the Debtor's figure) on the obligation to date. This is far less than the maximum permissible finance charge of $27,191.15 which ITT may legally collect in this transaction. Therefore, the Debtor, pursuant to our holding in *Kenderdine,* has not yet paid any "excess interest." As a result, no damages in her favor under 41 P.S. § 502 are triggered.

The Debtor also seeks treble damages based upon 73 P.S. § 201–9.2(a) of UDAP. This claim is also based upon the damages purportedly suffered by the Debtor in having allegedly paid excess interest to ITT. *Compare Russell, supra,* 72 B.R. at 870–72 (treble damages sought and awarded under UDAP only for the lender's having charged the borrower for a hidden broker's commission). However, no excess interest has as yet been paid by the Debtor to ITT under the holding in *Kenderdine* reiterated by us here. Therefore, no damages under UDAP, as under Act 6, may be awarded to the Debtor. *See Steinbrecher, supra,* 110 B.R. at 159 ("actual damage" requirements of Act 6 and UDAP are congruent).

■ Finally, as in *Kenderdine,* at 266–67, we conclude that the Debtor's success in obtaining a declaration that the loan in question is usurious constitutes sufficient prevalence in an action arising under Act 6 to trigger an award of attorneys' fees under 41 P.S. § 503 in her favor. It is, however, only the services expended on the Act 6 issues in this proceeding, as opposed to those expended on the unsuccessful, discrete TILA issues, for which the Debtor's counsel is entitled to compensation.

We have previously indicated that, since no proof of claim has been filed by ITT in this case, it is not our duty to fix the amount of the Debtor's obligation to ITT, at least at this juncture. *See* pages 483–484, 492–93 *supra*. In any event, conflicting claims of the parties and the lack of evidence supporting the position of either party on the issue of the total amount of payments made by the Debtor to ITT since the loan transaction was consummated would make ascertainment of ITT's valid claim against the Debtor impossible at this time. We will therefore restrict the Order resolving this adversary proceeding to a ruling in ITT's favor on the TILA issues, and a declaratory judgment in the Debtor's favor as to the claim that ITT is charging usurious interest and that she is entitled to an award of attorney's fees pursuant to 41 P.S. § 503 only in the Debtor's favor.

## E. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered, with an reminder that the Confirmation hearing in the Debtor's main case remains scheduled on October 11, 1990.

## ORDER

AND NOW, this 3rd day of October, 1990, after trial of this proceeding on August 14, 1990, and upon careful consideration of the Proposed Findings of Fact, Proposed Conclusions of Law, and Memoranda submitted by the parties, it is hereby ORDERED AND DECREED as follows;

1. Judgement is entered in favor of the Plaintiff–Debtor, RUBY GRIGSBY ("the Debtor"), and against the Defendant, THORP CONSUMER DISCOUNT CO. d/b/a ITT FINANCIAL SERVICES ("ITT"), as to Count I (Usury) of her Complaint only and in part only as to this Count.

2. It is DECLARED that the parties' loan transaction of September 18, 1990, is usurious and the contract of the parties shall be modified to conform to the rate of interest charged therein to 11.25 percent per annum, as explained in the within Opinion.

3. Judgment is entered in favor of ITT and against the Debtor as to Counts I (Turth-in-Lending) and III (unfair trade practices) in the Complaint and insofar as the Debtor seeks monetary damages in Count II based upon 41 P.S. § 502 in her usury claim against ITT.

4. The parties are urged to attempt to agree upon reasonable attorney's fees which are due to the Debtor's counsel pursuant to 41 P.S. § 503. However, if this matter is not resolved within fifteen (15) days, the Debtor's counsel may, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *In re Meade Land & Development Co.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987). If the Debtor's counsel has made a reasonable request for such fees which is refused, the said counsel may recover compensation for time spent on the fee application.

## ORDER

### Nov. 9, 1990.

AND NOW, this 9th day of November, 1990, after a colloquy with counsel in reference to the Debtor's Motion to Alter or Amend the Order of October 3, 1990, accompanying our Opinion of same date in this proceeding, on November 8, 1990, it is hereby ORDERED as follows:

1. The Motion is DENIED. Since there has still been no Proof of Claim filed by or on behalf of THORP CONSUMER DISCOUNT CO. d/b/a ITT FINANCIAL SERVICES ("ITT"), despite the admonitions on pages 484 & n. 1, 492, and 494 of the Opinion of October 3, 1990, reinforcing our reluctance to set the amount of the Debtor's liability to ITT. It would be grossly unfair to decide the issue of the total amount of ITT's potential (but unfiled) claim on the piecemeal record before the court in this proceeding, since ITT had no reason to know that the Plaintiffs were pressing for such a determination at trial.

With respect to the contention that this court overlooked the purported allocation of principal and interest set forth in the parties' contract, we conclude that this issue was not raised in the Motion and hence was finally determined in our Opinion. Paragraph 5(b) of the Motion, cited by the Debtor's counsel as raising this issue, in fact merely reiterates the request that we compute the total amount due to ITT from the Debtor. Furthermore, we doubt that the contract is clear enough on this issue to overcome the general rule recited at pages 491–493 of our Opinion.

2. The court *sua sponte* amends the Opinion of October 3, 1990, as follows:

[Editor's Note: these amendments have been incorporated in the opinion.]